```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4            v.                           20 CR 633 (JSR)

 5   LAURELL WELLS,

 6                Defendant.               Trial
     ------------------------------x

 7
                                          New York, N.Y.
 8                                        September 19, 2023
                                          9:30 a.m.
 9

10   Before:

11
                            HON. JED S. RAKOFF,
12
                                          District Judge
13
                              APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  JEFFREY COYLE
          KATHERINE CHENG
17        ALEXANDRA ROTHMAN
          Assistant United States Attorneys
18
     CROWELL & MORING LLP
19        Attorneys for Defendant
     BY:  KELLY T. CURRIE
20        GLEN G. McGORTY
          DANIELLE L. GIFFUNI
21        JESSICA FRANZETTI

22   Also Present:
     Isabel Loftus, Paralegal Specialist (USAO)
23   Phineas Santello, Paralegal Specialist (USAO)
     Richard Kasman, Paralegal Specialist (Crowell & Moring)
24

25
```

1          (Case called)

2          MR. COYLE:  Good morning, your Honor.

3          Jeff Coyle, Katherine Cheng and Alexandra Rothman, for

4     the government.  Joined by Phineas Santello and Isabel Loftus,

5     who are paralegals in our office.

6          THE COURT:  I think I've corrected you on this before.

7     They're paralegal specialists.

8          Thank you.  Good morning.

9          MR. CURRIE:  Good morning, your Honor.  Kelly Currie,

10    Glen McGorty, Jessica Franzetti and Danielle Giffuni, for Mr.

11    Wells.  Also joining us is Richard Kasman, who is a trial

12    specialist in our office.

13         THE COURT:  Trial specialist?  I take it they treat

14    you well, so.

15         Okay.  Please be seated.  Good morning everyone.

16         So the jury panel will be ready for us to start

17    picking the jury in 15 minutes.  So let's deal with everything

18    else that we need to deal with before that.

19         First, with respect to the fact that Mr. Wells is

20    wearing his prison garb, this was his choice but I think that

21    when we do the voir dire and I ask defense counsel to introduce

22    themselves and their client, you may just want to say something

23    about he's in prison garb as was his choice or something like

24    that, so that the jury is not left wondering about that.

25         Secondly, with respect to the motions in limine filed

1   by both sides, with respect to the defendant's motion to

2   exclude Mr. Wells' involvement in alleged frauds on JP Morgan

3   between 2011 and the start of the alleged conspiracy in 2017,

4   the government indicates that it will not be offering the

5   sentiments on its case in chief.  So the motion is granted on

6   that basis.  Now, this doesn't mean of course that if the

7   defense opens the door to cross-examination or the defendant

8   takes the stand, that this may not at that point become

9   admissible but at least for now it will be excluded.

10          Secondly, with respect to the government's motion to

11  remit the defendant's participation in a so-called instant

12  credit scheme which he allegedly participated as part of his

13  course of business with the person referred to in the papers

14  referred to as CC3, I am going to admit that evidence firstly

15  because I think it is part of THE overall evidence or

16  inextricably intertwined with the conspiracy and also that it

17  will be admissible under Section 404(b) of the Federal Rules of

18  Evidence.

19          However, I'm making that ruling contingent on the

20  government's representation that this will come in through

21  CC3's testimony and will relate to events that occurred during

22  the conspiratorial period AND that the specific events referred

23  to in this allege scheme occupied only approximately one month.

24  If it were to become something much more sensitive than that, I

25  would reconsider the ruling.

 1              Third, with respect to evidence that Mr. Wells was

 2     arrested in Rye Brook, New York, for cashing or attempting to

 3     cash fraudulent checks at M&T Bank branches, the government

 4     argues that this is part of the overall conspiracy and

 5     certainly, it is not precluded by the wording of the indictment

 6     which I will have to check in connection with this motion.  So,

 7     I will admit that evidence.  If defense counsel wants some sort

 8     of jury instruction when it comes in let me know at that time.

 9              Next and finally, with respect to the government's

10     motion to exclude evidence of the relationship between Faith

11     Brewster and Detective Spell, I think it's almost impossible to

12     rule on that at this time.  It will be highly dependent on

13     whether the door is opened to the government's direct testimony

14     of various witnesses or whether it logically should come in as

15     part of cross.  Defense has said they won't refer to it in

16     their opening.  I will hold them to that.  If and when the

17     defense believes the door has been opened or that it otherwise

18     becomes admissible you should approach the side bar before you

19     put any question about it and we'll deal with it then.

20              All right.  Turning to scheduling, we will sit most

21     days from 9:30 to 4:00 with a midmorning break, lunch between

22     1:00 and 2:00 and a brief afternoon break.  There may be days

23     when that will be slightly altered depending on other things I

24     have, but I'll let you always know at least the night before.

25              We will not, however, sit this Thursday and Friday

1   because I will be giving speeches in Washington D.C. on

2   Thursday in Minneapolis, Minnesota on Friday.  So, I won't be

3   around.  In terms of next week, from everything I have seen

4   this case probably can go to the jury on Wednesday or Thursday

5   but I could be wrong.  But I think in an excess of caution and

6   given that we won't be able to sit this Thursday and Friday, I

7   think we will sit on Monday and that's a Jewish holiday.  When

8   we're selecting the jury I'll ask the jury if any of them has a

9   problem with that and if they do, they'll be excused.  But I do

10  think we have to sit on Monday.

11          So, any question about the schedule?

12          MS. ROTHMAN:  Your Honor, with respect to sitting on

13  Monday, I think it's the government's view that the jury should

14  be selected without any regard to whether there's a conflict on

15  Monday.  It seems somewhat unfair to strike every juror who

16  observes the Yom Kippur holiday.  And so --

17          THE COURT:  What are you going to do when someone is

18  selected and then they say "oh, I can't come in Monday cause

19  I'm going to be in temple"?

20          MS. ROTHMAN:  Well then, I don't think we should,

21  respectfully, I don't think we should sit on Monday.

22          THE COURT:  Well, here's the problem you face.  I am

23  leaving on Sunday a week to give a speech in London.  Now, I

24  was planning in a moment of foolishness to stay there a few

25  days but I could turn around and come back, but I was hoping

1  that we could complete the trial before I go to London and I

2  think Monday is an important part of that plan.

3          MS. ROTHMAN:  I will say from the government's

4  perspective, we intend if we don't sit on Monday, we intend to

5  rest on Tuesday, likely.

6          THE COURT:  Okay.  That is more in accordance with --

7          MS. ROTHMAN:  I'll just say subject to

8  cross-examination, obviously.

9          THE COURT:  Yeah, well, all right.  The only other day

10 on that representation -- I'm happy not to sit son Monday -- is

11 that it will mean that they'll have a break of Thursday,

12 Friday, Saturday, Sunday, Monday but I don't think -- if you

13 follow state court trials you will know that's a short break

14 compared to what's going on in state court.

15         MS. ROTHMAN:  Yeah.

16         THE COURT:  Okay.  So unless defense counsel has any

17 problems, we will not sit on Monday.

18         MR. CURRIE:  No objection.

19         THE COURT:  In terms of jury selection, as some of you

20 may already know, I use the old jury box method.  So we will

21 call up initially 12 persons randomly selected.  I'll question

22 them for cause.  Some of them may be replaced.  Then counsel

23 will have peremptory challenges, six for the government and for

24 the defense.  We do this in rounds, six rounds, and the first

25 four rounds, two challenges for defense, one challenge for the

1    government.  The last two rounds it's one and one.  If you

2    don't exercise your challenge on a particular round but the

3    other side does, then you simply lose that challenge but you

4    don't lose your remaining challenges.  But if both sides waive

5    on a given round, then we have a jury.

6              Any questions about any of that?

7              MR. CURRIE:  No, your Honor.

8              MS. ROTHMAN:  No.

9              THE COURT:  So, although this is probably unnecessary,

10   I think we need to select three alternates in an excess of

11   caution and given the long break, things could happen.  So

12   after we've selected the main jury we'll select three

13   alternates with one round of challenges and that one round, one

14   for the government, two for the defense.

15             Okay.  How long does the government want for opening

16   statement?

17             MR. COYLE:  Less than ten minutes, your Honor.

18             THE COURT:  Defense?

19             MR. CURRIE:  Same, your Honor.

20             THE COURT:  Very good.  All right.

21             MR. MCGORTY:  Your Honor, I apologize to interrupt.

22   Mr. Wells has just advised me that he does not wish us to

23   proceed as his counsel.  Specifically, he asked me to indicate

24   to the Court, I believe he understands the conflict waiver from

25   yesterday.

1          THE COURT:  So --

2          MR. MCGORTY:  Just to lay it out for the record.  He

3     understands that we are able to cross and attack the JP Morgan

4     case, but he does not agree, as we don't agree with his theory

5     on how to do that and what to do that about.  So he wishes for

6     no one to represent him.

7          THE COURT:  Mr. Wells, at this point because we are

8     going forward with the trial today, you have two choices.  You

9     can either continue with counsel, counsel who is here or you

10    can represent yourself pro se.  But that's the only choices you

11    have.  There's some case law that says you don't even have the

12    second choice that at this point you can't suddenly say, oh,

13    having previously decided I didn't want to go pro se, I now

14    will.  But if you want to go pro se, I'll at least consider

15    that, but that is the only choice.  I am not going to appoint

16    new counsel.

17          THE DEFENDANT:  Yesterday you said I could get new

18    counsel to cross-examine Chase to ask them questions.

19          THE COURT:  No, I didn't say that.  Let's get the

20    record straight.  I suggested that current counsel should be

21    free to ask certain questions which I put on the record which

22    were favorable to your position but those were set forth

23    specifically in the transcript.  We can look at the transcript

24    and see what they are.  They're not saying they won't put

25    forward those questions if they are otherwise appropriate.  Of

course they have to meet the rules of evidence.  But they're
saying that your overall defense, which you articulated
yesterday about how there was a preexisting relationship
between Detective Spell and Ms. Brewster and how that impacted
what was presented to the grand jury, is not going to be
allowed.  I've ruled on that repeatedly.

        But that doesn't mean, for example, as you just heard
me say a few minutes ago, I'm not at this point either
admitting or precluding questions about the relationship
between Detective Spell and Ms. Brewster.  It depends how the
government proceeds and it depends how the cross-examination is
couched.  And I was very explicit in saying that I can't rule
on that in advance, that there might be situations in which the
door would be opened to that but there might not and I'll just
have to take it one question at a time.

        THE DEFENDANT:  Right.

        THE COURT:  So, they're not, they haven't remotely
suggested that they wouldn't put questions about that if they
were permitted to do.  The question will be if they are
permitted to do.  And as I again told them just give five
minutes ago, when that comes up, they have to approach the side
bar so I can rule at that time whether it's permissible or not.

        THE DEFENDANT:  From speaking with him and from
yesterday I was trying to understand, as I've said on the
record, whatever relationship they had I don't, that's between

```
 1    them two.  I was asking him, regardless of Faith Brewster and

 2    Detective Spell, I was asking him when you cross-examine the

 3    Chase Bank investigator, I would like to know how does this

 4    information relate back to me and he hasn't given me a concrete

 5    answer.

 6             THE COURT:  Well, I don't want to interfere with your

 7    conversation which are privileged between you and your counsel,

 8    but I assume that defense counsel is going to cross the Chase

 9    witnesses about what's the basis for their claim that it was

10    you that they were making these disclosures to or something

11    like that.

12             Am I wrong about that?

13             MR. MCGORTY:  Your Honor, you aren't wrong about what

14    we would do.  Your Honor, we don't expect that the government

15    can speak for themselves, but we don't expect based on the

16    evidence and the 3500 that JP Morgan's witness is going to

17    testify about anything other than the existence of the fraud

18    within the bank.  We may try and challenge that.  But that's

19    not about Mr. Wells' involvement.

20             THE COURT:  You don't think even they won't point to

21    Mr. Wells.

22             THE DEFENDANT:  Exactly.  That's what I'm saying,

23    Judge Rakoff.

24             THE COURT:  Wait a minute.  The point, Mr. Wells, is

25    this.  I understand that your defense includes your belief that
```

1    they cannot, these witnesses cannot be connected up to you.  If

2    the government on their direct doesn't try to connect it up to

3    you through those witnesses, then there's nothing to cross

4    about on that issue.  If they do, I assume there will be cross

5    on that issue.  Maybe -- I don't want to pursue this very long

6    because we want to pick the jury.  Maybe the government can

7    give me a hint of what a typical witness might say.

8         MS. CHENG:  Yes, your Honor.  We were planning to

9    raise this with you as well.  We do not expect the JP Morgan

10   investigator to testify about the link between Ms. Brewster and

11   defendant, which is based on hearsay.  However, we were

12   planning to elicit the fact that during the JPMorgan Chase

13   investigator's interview of Ms. Brewster, Ms. Brewster pulled

14   up her phone and provided a photograph from her phone to give

15   to the JPMorgan Chase investigator, and we would ask to admit

16   that photograph which is a photograph of the defendant.

17        And so we understand your ruling that you can't rule

18   on the admissibility of the relationship.  If you believe that

19   this would open the door to that relationship, then we would

20   not seek to admit just the photograph, but that's the extent --

21        THE COURT:  All right.  Well, that's a good example of

22   the situations that may come up.  If, for example, Mr. Wells

23   they don't admit the photograph, there's nothing to cross on

24   that subject.  If they seek to admit the photograph and I rule

25   that that opens the door, then there's plenty that your counsel

1   can bring out.  And if I say it doesn't open the door, then it

2   can't.  So, this is a good example of how we can't deal with

3   this in the abstract.  We have to wait till the exact question

4   is put.

5           But here is the question for you and I don't want to

6   take any further time.  You need to tell me right now do you

7   want to proceed pro se or do you want to proceed what your

8   current counsel?

9           THE DEFENDANT:  That's what I'm trying to clarify

10  right now.

11          THE COURT:  I want an answer.  I'm tired of speeches

12  from you Mr. Wells.  What's the answer; yes or no?

13          THE DEFENDANT:  I would like new counsel.

14          THE COURT:  You are not getting new counsel.

15          THE DEFENDANT:  I don't have none of your law or

16  capacity to represent myself so I will need counsel, cause if

17  they can provide a picture, then I should be able to

18  cross-examine that Chase investigator.  I want to know when

19  Faith Brewster was terminated.  There's a lot of questions to

20  be asked.  How does this bank information result to the --

21  that's all I want to know.  How does that reflect back to me.

22  I don't care about the sexual affair.  I don't care about that.

23  What happened at that JP Morgan Chase Bank, I want to know how

24  does that come back to me.  I have been in here for three years

25  asking the same question.  That's all I want to know.  I don't

 1     care about their sex affair.  I don't care if they got married.

 2     What happened at Chase Bank and how does it involve Laurell

 3     Wells?  That's all I want to know.

 4                 THE COURT:  So, the legal question is whether you want

 5     to represent yourself.

 6                 THE DEFENDANT:  I do not.

 7                 THE COURT:  Okay.  I'm not going to appoint new

 8     counsel.  So, we'll continue with current counsel.

 9                 Mr. Wells, I have understood from day one -- that is

10     why I've spent so much time in conversations with you and held

11     hearings and all like that -- that it's your position that you

12     were not connected to what with the government says you were

13     connected to.  So, of course, your counsel is going to, within

14     the rules of evidence, get into that.  But there are many ways

15     to get into it.  If a witness doesn't connect you, smart

16     counsel won't say, now let's talk about whether there are any

17     connections between you and Mr. Wells.  That would be stupid

18     because they already have what they need to make the argument

19     that there's no connection because it wasn't brought out on

20     direct.  So that's why we need to take it one step at a time.

21     But I have no doubt that your counsel -- and they can confirm

22     this or deny it -- are going to maintain through their

23     presentation that you are not accurately accused.  True?

24                 MR. CURRIE:  That's correct, judge.

25                 THE COURT:  And you have very experienced counsel.  I

1    wish you would give them a break.

2           THE DEFENDANT:  Your Honor, you said that.  Since they

3    got on my team I haven't made bail.  Nothing has worked in my

4    favor and this is supposed to be a great team.

5           THE COURT:  The person you need to blame for that is

6    me and more generally the law.  They have presented every

7    argument that the law permits and they've presented it

8    extremely well.  But unfortunately for you, in the end the

9    government has persuaded me that you're wrong on the legal

10   fronts.  The jury not me will denied the factual points and you

11   will operating in a clean slate.  You'll hear me tell the jury

12   right at the very beginning and again at several times during

13   the trial that you begin with a clean slate.  You are presumed

14   innocent, that this is a bedrock principle of our law and that

15   you can only be convicted if and only if they find you are

16   guilty beyond a reasonable doubt.  They're going to be the

17   judges of that, not me.

18           Okay.  Let's get the panel up.

19           (Recess)

20           THE COURT:  The government had something they wanted

21   it to raise?

22           MR. MCGORTY:  Your Honor, so after you left, Mr. Wells

23   explained to me a little bit of what he was trying to

24   communicate with you.  I'm going to just raise it with your

25   Honor.  We're not endorsing this view.  He is suggesting or he

1   specifically reiterated he does not trust us or our law firm.

2   But more to the point, your Honor, he says he referenced the

3   conflict waiver of yesterday and he said he understood that the

4   plea deal or to try to plead guilty, he had to waive the

5   conflict.  He couldn't plead guilty without a waiver of

6   conflict.  He said that was the purpose of him waiving the

7   conflict yesterday.  He is saying he never wanted us to

8   represent him at trial.  He could articulate that better than

9   me but --

10          THE DEFENDANT:  You nailed it.

11          THE COURT:  Mr. Wells, the record will speak for

12   itself, but my recollection is that after defense counsel

13   raised the point that the conflict was not as dramatic in terms

14   of a plea as it might be in terms of the trial, I rejected that

15   and said specifically, now we're going to consider it across

16   the board.

17          Having said that just this morning, Mr. Wells said to

18   me just a few minutes ago that he didn't care about the

19   conflict.  He didn't think it was of any importance.  what he

20   was upset about was his view that defense counsel wasn't going

21   to present what he thought he ought to present and it had

22   nothing to do with the question of the cross-examining Chase

23   employees and he said all that to me -- and even gestured as he

24   said it -- that he didn't care about, he said it's all between

25   them and I don't care.  So I don't understand his current

 1    application.

 2            MR. MCGORTY:  Your Honor, just to be clear, that

 3    reference about not caring was about the relationship between

 4    Spell and Faith Brewster.  Unfortunately, he has been

 5    consistent on a belief that we are not going to cross examine

 6    JP Morgan the way he wants us to and as aggressively as he

 7    thinks we should.  And in our expert opinion or experienced

 8    opinion we related to him why we don't think it's appropriate.

 9    He is saying, just so the record is clear -- he could speak for

10    himself -- he said --

11            THE COURT:  Let's hear from him.

12            So, Mr. Wells, we went through yesterday whether or

13    not you wanted to waive, give up any claim that the fact that

14    your lawyer's firm had represented Chase would be a problem in

15    their cross-examining the Chase employees, and you said it was

16    not a problem.  In fact, if I recall correctly, you said that

17    under oath.

18            THE DEFENDANT:  Yesterday he said --

19            THE COURT:  No.  No.  So, now you are taking a

20    different position?

21            THE DEFENDANT:  Not a different position.  He said

22    when I came into the courtroom that, oh, we can cross-examine

23    Chase but just not the way you want to.  I'm confused.  What

24    does that mean?

25            THE COURT:  I'm not confused cause he said it many

1   times.

2          THE DEFENDANT:  I don't trust this firm.  So --

3          THE COURT:  Well --

4          THE DEFENDANT:  On the record, I don't trust this

5   firm.  I do not wish to move forward to trial with this firm.

6   I would like a firm that will ask the questions directly, how

7   does this information tie back to Laurell Wells?  That's what I

8   want to know.  How does this information -- I don't know who

9   uses this information.

10          THE COURT:  So, you can have a thousand firms and if I

11   rule that that's not admissible, it's not going to be admitted.

12          THE DEFENDANT:  So then I'm lost before I even

13   started.  It's already determined.

14          THE COURT:  No.  Mr. Wells, this Court has extended

15   you every conceivable courtesy and more than that, well beyond

16   what the law requires.  Because when all is said and done,

17   Mr. Wells, I continue to feel some sympathy for you and I wish

18   you weren't constantly shooting yourself in the foot.  You're a

19   person of intelligence.  You are a person who has strong

20   beliefs but sometimes those beliefs don't accord with the law.

21   And you think that just because you feel strongly about a

22   matter that your counsel, whoever they may be, can break the

23   law and put questions that are not permitted, and that's not

24   the law.

25          So really you put them in a very awkward position.

1    They want to be as great a help to you as they possibly can.

2    But what they are not willing to do is break their oath to

3    abide by the law.  And when you ask them to ask questions that

4    the law does not permit and that I've indicated that the law

5    does not permit, then you're asking them to break the law and

6    they are not willing to do that and I support them totally in

7    that respect.

8           That's going to be true whether you get one new

9    counsel, five thousand new counsel or a million new counsel.

10   They all have to abide by the law.  And if you keep asking

11   them, because you are so convinced of your view, to break the

12   law and ask questions that the law doesn't permit them to ask,

13   you're just shooting yourself in the foot, as I indicated

14   previously.

15          Let's go over this one more time.  I think you have

16   told me repeatedly that you don't want to proceed pro se,

17   correct?

18          THE DEFENDANT:  Yes.

19          THE COURT:  Okay.  You're now saying that you waive

20   the conflict.  You understand what I mean by "waive the

21   conflict"?  You gave up any claim that they were conflicted in

22   representing you because you thought that was just in

23   connection with taking a plea.

24          Do I understand that's your current position?

25          THE DEFENDANT:  Yes.

1          THE COURT:  Why would it make any difference if it was

2     in connection with taking a plea or otherwise?

3          THE DEFENDANT:  Because he said that, well, if we

4     represent you, we can't cross-examine the --

5          Don't do that.  You know what you said.  You said you

6     can't cross-examine Chase cause our firm represents them.  This

7     is what you said even at the hearing.  Before the hearing you

8     came back there and said oh, you have to sign a waiver.  No.

9     This is the person that wrote the report.  I have a right to

10    ask these questions and you are saying --

11         THE COURT:  No, no.  Your counsel has never ever said

12    that.

13         THE DEFENDANT:  I'm getting different stories.  I'm

14    telling you, your Honor, what is going on behind closed doors

15    is not what is going on in front of me.

16         THE COURT:  If you -- just to show you what you are

17    asking for -- if I appointed new counsel -- this would be your

18    fifth.  The trial of this case would probably have to be put

19    off at least six months because I have a very, very complicated

20    and hectic trial schedule.  Do you really want that?

21         THE DEFENDANT:  As long as we get the truth I don't

22    care what they do.  I want to get to the bottom of this now.

23         THE COURT:  What do you mean?

24         THE DEFENDANT:  I want to get the truth.  Where did

25    this Chase information come from?  Why am I being accused of a

1  crime that happened somewhere has nothing to do with me.  I've

2  been asking for dialogue for three years.  Where is this

3  conversation between me and this woman?  Where is this

4  information that was used?  How did this come to me?

5          THE COURT:  So, that is going to be what the

6  government's witnesses will say and your counsel, contrary to

7  what you just said, has repeatedly represented that with the

8  waiver that you gave, they are prepared to vigorously

9  cross-examine those witnesses.  They just don't feel they can

10 in cross-examining they can break the law and ask questions

11 that the Court doesn't permit.

12          Do you want them to break the law?

13          THE DEFENDANT:  I do not, no, sir.  If it takes six

14 months, let's do it.  I'm doing but hard time.  I'm all right.

15          THE COURT:  So, let me ask the government, we can

16 either -- I think there is at least an argument -- I don't have

17 the transcript from yesterday -- that the waiver was placed by

18 defense counsel in the context of the plea and not necessarily

19 despite the Court's best efforts to broaden to the context of

20 the trial.  So, assuming for the sake of argument that is the

21 situation, then do I not have to appoint new counsel to

22 represent even if it means, as the defendant recognizes, a

23 six-month delay?

24          MS. ROTHMAN:  Your Honor, a few points.  First,

25 respectfully, we don't think there's a conflict here.  We think

1    that the Court chose to hold a Curcio in an abundance of

2    caution, but given the limited scope of the investigator's

3    testimony, the fact that defense counsel's representation of JP

4    Morgan is entirely unrelated to the narrow focus of her

5    testimony today, we think the Court could have found no

6    conflict, no Curcio, and just proceeded.  And I think the Court

7    could still do that if it chose to.

8            What I don't actually hear from the defendant in what

9    he is saying is if the Court decides to proceed with a Curcio,

10   a refusal to waive a conflict purported conflict, what I still

11   hear is a disagreement over trial strategy.  Simply, the

12   defendant wants certain questions posed to the JP Morgan

13   investigator.  Defense counsel is saying we're not going to ask

14   those not because of our relationship with JP Morgan but

15   because we don't think they're proper questions.  So, I don't

16   think the Court needs to take this trial six months, eight

17   months to find ourselves in the same situation where defense

18   counsel is likely going to say, we are not going to ask those

19   questions because they're not proper questions.

20           And I think if the Court wanted to, it could do

21   another Curcio.  I don't think it has to.  I think the Court

22   can proceed as we are right now.  And so I don't think an

23   adjournment is appropriate at this point when trial has been

24   adjourned several times, the defendant has had several changes

25   of counsel and at this point the parties are ready to proceed

1       to trial.

2               THE COURT:  So let me ask defense counsel since you're

3       on your feet, it is true that I undertook the Curcio hearing

4       just because I thought that was the safer course.  But why is

5       there a trial?

6               MR. MCGORTY:  Your Honor, again, we received guidance

7       from our general counsel at our law firm who does this all the

8       time, and he echoed what we believe which is that there's no

9       purer conflict than cross-examining the client on the stand.

10      And I think it was appropriate for there to be a waiver.  And I

11      think frankly personally it is in Mr. Well's interest to

12      continue as his counsel -- he waived.  However, the record

13      suggested that the waiver, and I know from what he said to us

14      that he was waiving cause he had to plead guilty.  That said,

15      your Honor, just to the government's point, there is no

16      dispute.  There is conflict.  The record cannot be made.  If

17      the waiver is sufficient as it is, your Honor, Rules of

18      Evidence find that there has to be a conflict waiver from both

19      of our clients.

20              Here is the reason.  The conflict goes to the heart of

21      what Mr. Wells wants with his representation.  He thinks he

22      wants the JP Morgan cross a particular way.  A particular way.

23      If he doesn't waive the conflict that he will be able to argue

24      on appeal that we unethically represented him by being

25      conflicted counsel pulling our punches on cross.  We have a

1   waiver from JP Morgan which let's us cross in the first place

2   but without a waiver from Mr. Wells he is stuck with lawyers

3   who he says he doesn't trust in part because of this issue to

4   cross-examine our client on something that he believes is

5   critical to his defense.

6         I don't know how the government could say there is no

7   conflict.  It's a waivable one.  We acquired a waiver from JP

8   Morgan.  We asked for a Curcio hearing because we thought Mr.

9   Wells needed one.  He could have a Curcio counsel appointed if

10  he needed more -- I think your Honor's allocution of him was

11  sufficient on its face that he didn't need counsel.  But he's

12  saying today and again, I understand everyone's frustration and

13  I do think he should stick with us and we should go forward in

14  his interest, but he is saying on the record, I didn't waive

15  the conflict for you guys to try this case.  I waived the

16  conflict because you told me I had to waive the conflict to

17  plea.

18        Just to be clear, while I think we have a disagreement

19  about the approach which is never a reason for you to relieve

20  us, right, another lawyer who has the same problem Mr. Wells

21  won't get relieved because of a conflict issue, a separate

22  issue.  I am as frustrated as everyone about the process but

23  the record has to be clear on that because there is a conflict.

24        THE COURT:  Well, did and I order --

25        Linda, tell the jury clerk that regretfully we have to

```
 1    call everybody back in about a half hour so she can take the

 2    jurors back down to their room.  We will have a resolution of

 3    this within a half hour.  I'll wait for the court reporter then

 4    to provide me with yesterday's transcript.  The only part I

 5    need is the Curcio.

 6              I'll look at it and I think the question is this.  I

 7    am persuaded that there has to be a waiver of the conflict.

 8    What I am less clear about is whether the waiver that was given

 9    yesterday included a waiver for all purposes or just for a

10    guilty plea.  I do remember questioning the narrowness of the

11    defense approach, but on the other hand I think I may have said

12    something during the hearing itself about how?  The context of

13    a guilty plea is even less of a problem, but I want to look at

14    it.

15              So we'll break for about 15 minutes.  I'll look at it.

16    We'll come back and I'll rule one way or the other.  I don't

17    think the government's suggestion to have a new Curcio hearing

18    makes any sense because that doesn't take account of what I

19    would call Mr. Wells' psychology.  So I think we should just

20    look at what was done yesterday and that's still binding upon

21    Mr. Wells and everyone else.

22              MR. MCGORTY:  One point to raise.  Your Honor said

23    earlier that you believed you had questioned him about,

24    specifically, about cross-examining witnesses.  We think that

25    would be a relevant factor.  I don't remember whether it
```

1    happened or not.  If you did we think that probably would be

2    dispositive.

3            THE COURT:  All right.  So let me see what the

4    transcript says.  Then we'll see if we go forward or not.

5    Okay.

6            (Recess)

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          THE COURT:  Before I address the *Curcio* issue, I

 2  noticed in the government's listing of its witnesses yesterday

 3  that, unless I missed it, there is only one Chase employee who

 4  is being called as a witness.  Is that right?

 5          MS. ROTHMAN:  That's correct.

 6          THE COURT:  That's the investigator.

 7          MS. ROTHMAN:  Yes.  Ms. Jesurum.

 8          THE COURT:  What is she going to say?

 9          MS. ROTHMAN:  She is going to testify very briefly to

10  the fact that she learned of several flagged transactions at JP

11  Morgan.  She gathered the records.  She identified they were

12  all conducted by the same bank teller, Faith Brewster.  She

13  pulled the records, interviewed Faith Brewster, Ms. Brewster

14  was terminated.  And during the course of that interview she

15  obtained from Ms. Brewster's cell phone a photograph of the

16  defendant.  That's it.

17          THE DEFENDANT:  Not the phone number.

18          THE COURT:  Mr. Wells.

19          THE DEFENDANT:  I'm sorry.

20          THE COURT:  I am just wondering, other than the last

21  item, which might open the door to the relationship, why do you

22  even need that testimony?  Why is it particularly material?

23          MS. ROTHMAN:  Well, your Honor, it's corroborative of

24  the testimony of Ms. Robbins, who was one of the defendant's

25  coconspirators.

1          THE COURT:  I understand it might be corroborative.

2          MS. ROTHMAN:  And there will be a victim who will

3    testify that she was one of the accounts the defendant

4    fraudulently cashed a check into, and you'll also see from the

5    investigator's testimony that that was one of the accounts she

6    pulled as part of their review of fraudulent transactions.

7          THE COURT:  It seems to me that one way to resolve

8    this would be if the government wished, it's totally the

9    government's choice, if you wish not to call that investigator,

10   then there is no conflict issue at all because there is no

11   Chase employee.  It then disappears.  That's one possibility.

12         Turning to the *Curcio* hearing itself, looking at the

13   transcript from yesterday afternoon, there was the statement by

14   Mr. McGorty that I think was perhaps, in hindsight, a little

15   unfortunate.  This is on page 2 beginning line 11.

16         Your Honor, before you proceed, the *Curcio* is premised

17   on, unless Mr. Wells has changed his mind, on his decision to

18   plead guilty.  I don't know if he wants to address the Court on

19   his ultimate decision, but I want him to have the opportunity

20   to indicate to the Court whether he is going to plead guilty or

21   not.  And if he is going to plead guilty, obviously, we need a

22   *Curcio*.  If he is not, then that's a different question about

23   the conflict.

24         And then the Court stated on page 2 at line 23:  No,

25   no.  Here is the -- I'm actually not sure that the *Curcio*

 1   hearing has to make this limitation.  But just so that you are

 2   clear, the supposed conflict arises from the fact that the firm

 3   of which the defense counsel or lawyers previously represented

 4   Chase Bank in some unrelated matters.  If the case went to

 5   trial -- and then the defendant interrupts to say right.  The

 6   Court continues.  This is now at page 3, line 5:  They would

 7   have to cross-examine -- if they were your attorneys, they

 8   would have to cross-examine the Chase employees, and

 9   theoretically they might be less assiduous in doing so because

10   of the firm's representation of Chase in other matters; I

11   guess, to be frank, a very unlikely hypothetical.  But in any

12   event, Chase has already said they don't care if their

13   witnesses are cross-examined by these attorneys, and then the

14   question is whether you care.

15          "THE DEFENDANT:  OK.

16          "THE COURT:  What they were just saying was, it

17   becomes much less of an issue, if an issue at all, if you're

18   pleading guilty because then there won't be any witnesses.

19   It's conceivable that the probation officer preparing the

20   presentence report might interview the Chase people or

21   whatever, but it's not like there are going to be witnesses on

22   the stand before a jury testifying against you.  Nevertheless,

23   even if you intend to plead guilty, you can't go forward with

24   these lawyers unless you assure me that you have no problem

25   going forward with these lawyers and that's the whole point.

1    Do you understand?

2           The defendant says:  I understand the aspect.  Just

3    another piece of clarity since we are here.  Moving forward to

4    trial, the question is, what am I fighting at trial?  What

5    would be used against me?  What am I fighting?

6           Then there is this long interchange in which

7    eventually I asked the government to say who their witnesses

8    were, and they listed a bunch of witnesses of whom only one was

9    a Chase employee.

10          Now, going on, we then got into the more formal *Curcio*

11   hearing beginning at page 7, and there the Court broadened the

12   questioning considerably.  This is at line 12:

13          "THE COURT:  You are aware, are you not, that their

14   law firm has represented JP Morgan Chase in various matters

15   unrelated to your matter.  Are you aware of that?

16          "THE DEFENDANT:  Yes.

17          "THE COURT:  Now, you're entitled to counsel who has

18   only your interests at heart, and theoretically they could be

19   influenced by the fact that their firm represents Chase, but

20   they have already received agreement from Chase that they can

21   go after the Chase witnesses.

22          Do you understand that?

23          "THE DEFENDANT:  Yes.

24          "THE COURT:  Do you understand that it's up to you,

25   therefore, to decide whether or not to allow them to continue

1    as your attorneys, notwithstanding this theoretical conflict?

2    Do you understand?

3              "THE DEFENDANT:  Yes.

4              "THE COURT:  Are you prepared to go ahead and have

5    them represent you going forward?

6              "THE DEFENDANT:  Yes.

7              "THE COURT:  Do you want to have me appoint an

8    independent lawyer to consult with this conflict question or

9    are you prepared to go forward?

10             "THE DEFENDANT:  I am prepared to go forward."

11             I think if we were only looking at that last part of

12   testimony, that formal *Curcio* questioning, there was a total

13   waiver in all respects.

14             The only thing that gives me pause was the prelude in

15   which the defense counsel attempted to narrow or at least, as I

16   interpreted it, place a narrower spin on the waiver.  Although

17   I didn't adopt that and specifically declined to adopt it, I

18   did explain to the defendant that that's what his counsel was

19   saying about it.

20             Also, all of this was in the context of

21   cross-examining Chase witnesses, whereas the argument might be

22   made that there was -- even without a Chase witness, there was

23   still a conflict because the very fact of the representation of

24   Chase, which was in some sense a victim, could impact the

25   assiduousness of the waiver, the assiduousness of the

1      representation.  Excuse me.

2              Let me hear what is the government's view, what is

3      defense counsel's view, what is Mr. Wells' view, and then I'll

4      rule.

5              MS. ROTHMAN:  Your Honor, the government submits that

6      the *Curcio* that the Court conducted is more than sufficient to

7      inform the defendant of the potential conflict in this case and

8      that the defendant knowingly waived that conflict and that we

9      can proceed.

10             We don't think the Court's questioning was limited in

11     any way, the Court's questioning to the idea of the guilty

12     plea, and in fact the Court repeatedly mentioned the

13     possibility of Chase witnesses, which is really what the

14     question is here today, the ability for defense counsel to

15     adequately cross-examine one Chase investigator who has very

16     narrow testimony.

17             I will just note, we don't intend for the investigator

18     to offer the phone number for the defendant, any statements Ms.

19     Brewster made through the investigator.  And perhaps, upon

20     hearing that, some of the concerns that the defendant may have

21     had are now ameliorated.  Her testimony is so narrow and does

22     not improperly offer hearsay statements.

23             In light of that, we think there is no basis to reject

24     the *Curcio* from yesterday, no basis to find that we cannot

25     proceed to trial today, so I think the Court should find it was

         1   sufficient, and we should get the jury in and we should start.

         2               THE COURT:  Let me hear from defense counsel.

         3               MR. McGORTY:  Your Honor, briefly just on the last

         4   point.

         5               Counsel has raised arguments why ultimately if

         6   Mr. Wells wanted to proceed to trial today, it may be wise for

         7   him to waive this conflict.  Our position, your Honor, based on

         8   the *Curcio*, it is not a known waiver.  Just for two points,

         9   your Honor.

        10               First, that preamble, it was unfortunate based on our

        11   circumstances here that I said it, but I did say it

        12   intentionally not to explain or limit the *Curcio*.  I was

        13   reflecting what was specifically communicated to me by my

        14   client of what he wanted to do.  I wasn't -- that wasn't for

        15   me.  I am articulating for the Court that he wants to waive the

        16   conflict for the purposes of the plea.

        17               All the talk about cross-examination in the preamble,

        18   your Honor, if anything, projected to Mr. Wells the difference

        19   between the circumstances of going to trial versus the

        20   circumstances of pleading guilty.  He specifically said, your

        21   Honor, that it's unlikely that the probation officer is going

        22   to call or interview a Chase witness, but that it could give

        23   rise to that concern.  Absent that, it is a different scenario

        24   than if we are going to trial.  That's what was communicated.

        25               And in the actual *Curcio*, while reading it, without

knowing the context, I think it's sufficient and a broad waiver

for all purposes.  But we know going into it, your Honor, that

he was waiving the conflict for the purposes of pleading

guilty, and specifically there wasn't a question -- you asked

the government if they had any questions.  They didn't.  We

would not have had either had you asked us.

        But the additional question that could have been asked

is, if you do not plead guilty and proceed to trial, you

understand you are waiving this conflict as to these lawyers

who will be able to cross-examine these witnesses, and you will

not have a right to argue that they were conflicted, because

the concern on appeal is that he will say that whatever we do

with respect to this JP Morgan witness now, or even his ability

to call them on his own, is going to be -- we are going to be

pulling our punches because of the conflict.

        I have no problem with him waiving the conflict, your

Honor.  We can get going with the jury, as counsel suggests,

but it has to be a knowing waiver under the circumstances where

we are here today.  And I think had he asked for independent

*Curcio* counsel yesterday, they would have told him all this in

detail.

        THE COURT:  He was made that offer and he said no.

        MR. McGORTY:  No argument to that, your Honor.

        But I do think it is because in his mind he didn't get

the clarification in the *Curcio*, saying this is for this

1      purpose and not the other.  What I said at the beginning was

2      only because that's why he was waiving the *Curcio*, as were his

3      words.

4                    THE COURT:  OK.

5                    Mr. Wells.

6                    THE DEFENDANT:  Just to touch a little bit about what

7      the prosecution said about Biviana Jesurum.

8                    I am getting to the issues.  Please stop trying to cut

9      me off.

10                   As she just said, the testimony of Biviana Jesurum,

11     her testimony is based on that six-page confession, so she

12     cannot testify about something that was given to her because,

13     once again, if this was given, this is hearsay.

14                   THE COURT:  Let's take that as a good point.

15                   THE DEFENDANT:  Thank you.

16                   THE COURT:  If it's hearsay and doesn't fit within any

17     of the exceptions to the hearsay rule, then I will rule it

18     inadmissible.  That has nothing to do with conflicts.

19                   THE DEFENDANT:  OK.

20                   The other conflict, as far as like the Chase Bank,

21     Summer Robbins is not a Chase Bank witness.  This is a

22     Detective Spell's witness.  That right there is tainted.  There

23     is no way -- this person's name is not in that six-page

24     confession.  This is the Detective Spell witness.  So is

25     Tran --

```
 1                 THE COURT:  What do you mean, a Detective Spell
 2     witness?
 3                 THE DEFENDANT:  Detective Spell's witness is --
 4                 THE COURT:  I understand what you mean.  A witness is
 5     a witness.
 6                 THE DEFENDANT:  You said, as of yesterday, yesterday,
 7     when we had the hearing yesterday, this name, Summer Robbins,
 8     was brought up by the government, and I said:  Wait.  That's
 9     not a Chase Bank witness.  That's a Detective Spell witness.
10                 THE COURT:  This has been part of the problem.  It
11     doesn't matter whether they first learned of a witness' name
12     through Detective Spell or through Chase or through the man on
13     the moon.  What matters is what the witness is prepared to
14     testify to under oath.
15                 THE DEFENDANT:  I thought anything that came from
16     Detective Spell cannot be used, anything that came after Chase
17     Bank.
18                 THE COURT:  No, no, no.  That's a different question.
19                 The question is whether it opens the door to
20     cross-examination about the witness' relationship with
21     Detective Spell or how -- who she told whatever she said to.
22     That might or might not open the door.  I haven't ruled on
23     that, as you know, but it's not -- someone doesn't just cease
24     to be a witness because the first time the government learned
25     about them was through someone who was tainted.  That's not the
```

1    law.

2          Do you understand the distinction I'm making?  If

3    someone came to the government's attention because someone with

4    a motive to pin it on you brought it to the government's

5    attention, that doesn't mean that the government can't call

6    that person to testify.  What it might mean is, it might open

7    the door to some questions about Detective Spell.  I haven't

8    ruled on that yet.  You see the distinction?  It doesn't

9    preclude calling the witness.  It just precludes -- it just

10   creates a situation where maybe the cross-examination will be

11   broader than it otherwise would be.

12         Let me ask the government, assuming for the sake of

13   argument that my ruling would be materially affected by whether

14   or not you call that investigator, what is your view?

15         MS. ROTHMAN:  Just so I understand what the Court is

16   saying -- again, this is complicated by the fact that what I

17   really hear is a strategic disagreement between defense counsel

18   and the defendant.  But if what the Court is saying --

19         THE COURT:  I agree with that.

20         And I also agree that cuts against appointing new

21   counsel in some respects because that's been an ongoing

22   problem.  That's why Mr. Wells has had so many attorneys,

23   because as much as I have tried to explain things to him and

24   much as I admire that he is an intelligent person, he gets so

25   committed to his theories that he's unwilling to open his mind

1     to the possibility that some of them may not be legally

2     relevant.

3            I am at a loss as to how to communicate with you,

4     because I have tried so hard, and the reason I have tried so

5     hard is because you are a fellow human being.  You deserve the

6     same respect as every human being has.  But I am frustrated by

7     the fact that I can't seem to get across to you that certain

8     positions that you want your attorneys to take are legally not

9     permitted.  I didn't make up the law.  The law is there.  But I

10    apply the law.  And so much as you feel strongly about certain

11    issues, if they are not legally relevant, I am not going to let

12    them in.

13           Going back, though, to the government, I hear all you

14    are saying, but I still want an answer to my question.

15           MS. ROTHMAN:  Just so I understand the Court's

16    question, what I think the Court is saying is, if I am inclined

17    to say I don't think the *Curcio* was good enough and, therefore,

18    I am going to kick this six months, would the government then

19    say we are not going to call the investigator so we can

20    proceed?  Is that what the Court is saying?

21           THE COURT:  What I'm saying -- you're as good as

22    Mr. Wells as putting the questions back to the Court.

23           MS. ROTHMAN:  I don't know if I want that honor.

24           THE COURT:  Here is what I think.  I think the formal

25    part of the *Curcio* hearing was across the board.  Nevertheless,

 1    it had a context and the context was brought out in that

 2    earlier colloquy.

 3         And I think the reason I'm putting this question to

 4    the government is that while I am still inclined to think that

 5    the *Curcio* hearing was sufficient, I would feel more

 6    comfortable if it became even less material, potentially

 7    material.  Because if there is no one from Chase to

 8    cross-examine, then that's not perhaps technically the end of

 9    the conflict, but it certainly goes to the weight of the

10    conflict.

11         MS. ROTHMAN:  Here is what I can say, your Honor.  We

12    do not intend to open on the Chase investigator in that we are

13    not going to refer to her by name in our opening, and in fact,

14    and Mr. Coyle can check, I don't even think the fact of the

15    investigation at Chase gets specifically mentioned in our

16    opening.  There is a lot of bank fraud here at other banks, and

17    I think the Court will see, we don't get into specifics in the

18    opening.

19         We are prepared to proceed in light of the Court's, I

20    think, correct inclination.  The *Curcio* was sufficient.  I

21    think we want to talk a little bit internally if we ultimately

22    decide not to call her or perhaps can talk about a stipulation.

23    But, as we have said, her testimony, as we envision it, is so

24    narrow, without identifying the defendant by name, without

25    providing any information in the substance of that statement

1   that Ms. Brewster made, so I think that also reduces any

2   possible risk in light of just how narrow her testimony is and

3   how limited the grounds of potential cross-examination are for

4   this witness.

5          THE COURT:  Let me hear from defense counsel.  Before

6   you address the Court, let me ask you this.  The ultimate

7   question in which a *Curcio* hearing is directed is not so much

8   related to specific witnesses.  It is to whether or not you can

9   be totally devoted to your client's interests and whether he

10  has a reason to doubt your devotion to it.

11         On the first thing, I think there is no question

12  you're totally devoted to his interests.  I think you have

13  proven that again and again and again during the course of your

14  representation.

15         I'm more concerned whether he doesn't have confidence

16  in any of his lawyers because he thinks he knows better.

17  That's been a problem from day one.  But that kind of lack of

18  confidence is not a reason to get him a new attorney.  I

19  predict that whatever attorney I get for him, he will find that

20  attorney inadequate.  But, on the other hand, unlike that

21  general problem, he also has more objectively a possible

22  problem with having someone who nevertheless is linked to Chase

23  continue as his lawyer.

24         What do you say to all that?

25         MR. McGORTY:  Your Honor, just on the last point, that

 1   is the only basis here for replacement of counsel because we do

 2   not think -- to be clear on the record, strategic differences

 3   has been the centerpiece of what we have been trying to explain

 4   to him and ask the Court to help with.  That's not the basis

 5   for the problem here.

 6          Whatever Mr. Wells' reasons are, it's kind of a black

 7   and white binary issue.  He needs to have a clear waiver of

 8   this conflict.  It's not as to -- it's a conflict, period.

 9   It's not as to a particular witness.

10          The reason we think there is a conflict that arose is

11   not because of JP Morgan's status at a victim.  It's because

12   the government has had to rely now on evidence coming through

13   JP Morgan in the form of an investigator, and, frankly, I am

14   not sure whether he would permit us to stipulate away testimony

15   because --

16          THE COURT:  That's a good point.  In some ways,

17   ironically, it is Detective Spell who put all of us in this

18   box.

19          MS. ROTHMAN:  Could I just say on that, the

20   investigator's testimony stops before Detective Spell even gets

21   involved.

22          THE COURT:  That's why I have told Mr. Wells

23   repeatedly that all the questions he thinks his counsel should

24   put are probably not going to be allowed, because, as his own

25   counsel recognizes and as anyone would recognize, the

1   involvement of Detective Spell postdated the fundamental issues

2   that gave rise to this prosecution.

3          MR. McGORTY:  Your Honor, on that point, absolutely

4   true, absolutely true.  That's not our client's position.  We

5   believe that's what the evidence states.  It's not the absence

6   of Detective Spell that creates the conflict -- not the

7   conflict.  That creates the dilemma that we are in that creates

8   the conflict.  It's absence of Faith Brewster.  The government

9   has decided strategically it is not going to call Faith

10  Brewster, understandably, that it does not want to open the

11  door to Detective Spell and their illicit relationship.  As a

12  result, they are attempting to offer evidence both about the

13  investigation, which they always could have, but also through a

14  photograph that she gave him, which we think is objectionable,

15  but that's a secondary issue, to get that in through this

16  investigator.  The reality is, your Honor, that was the

17  triggering event of this.

18          What has broadened now is our client's desire to have

19  an attorney that will attack JP Morgan in a broader way than we

20  think strategically is appropriate and, frankly, based on the

21  law as well, what we may be limited to do, any lawyer would be

22  limited to do.

23          It's not the limitations of the law that any lawyer

24  would be able to do.  That's a fine argument that would never

25  prevail, no lawyer can do something.  But when we are

strategically telling our client, that is not what you should,

and he's telling us, that's because you represent JP Morgan, I

don't trust you, I do not trust you or your firm.  Then where

we are.

          THE DEFENDANT:  Because when it's all said and done,

we are moving forward with hearsay.  Detective Spell can't

testify.  Faith Brewster can't testify.  Rosenman can't

testify.

          As you just said, we are all here because of Detective

Spell's mess.  So, once again, if they are not here to fight

for their own battle, how can we proceed with hearsay.  If this

six-page document was given to Chase Bank, it's not just a

photo.  Remember, it entailed a suspect's name, two phone

numbers, and the photo.

          Once again, if you have this -- Biviana Jesurum on the

stand, that's hearsay.  I am trying to get clarity.  How can we

move forward.

          THE COURT:  Mr. Wells, you do not understand the

hearsay rule, clearly.  I'm sorry.  If someone testifies, as

numerous of the government witnesses are apparently going to

testify as to what they did and what happened to their

accounts, that's not hearsay.  That's personal knowledge.  You

don't understand the hearsay rule.  I'm sorry.

          I think the fundamental problem is that there was an

objective basis for someone in Mr. Wells' position to be

concerned, rightly or wrongly, about how assiduous his lawyers

would be in his defense, given the relationship of the firm to

Chase.

     The fact of the matter is, they have been highly

assiduous in their defense.  Mr. Wells, of course being

Mr. Wells, doesn't remotely understand how good his attorneys

have been for him, but that's because he's a stubborn person.

     But because there was at least objectively an issue,

then the question becomes, was the *Curcio* waiver sufficiently

broad to eliminate that issue.  He was free to waive anything

he wanted to.  Did he waive this conflict or did he only waive

it in the context of, I'll waive it for purposes of the plea

but not otherwise.  And I think that's what it still comes down

to.

     There is the subsidiary issue of how material it is.

That's why I put the question about the witness to defense

counsel, because if the case doesn't involve any Chase

employee, that certainly should ease objectively some of the

concerns, but it's not the end of the question because Chase is

still involved.

     Is there anything further the government wanted to

say?

     MR. COYLE:  Your Honor, we just want to put out there

that it seems like this is all borne from a misunderstanding,

that the reason the defendant doesn't want to waive is because

1    he wants to challenge what he deems to be the impermissible

2    hearsay offered through the statement of Faith Brewster.  The

3    government is not offering that.

4              THE DEFENDANT:  You're not using Biviana Jesurum.  If

5    you are not using her, we can proceed.  If you are not using

6    her, we can proceed.

7              MR. COYLE:  We are calling Biviana Jesurum

8    specifically to establish that there was a teller named Faith

9    Brewster who was connected to fraudulent transactions.  It does

10   not tie to the defendant.

11             THE DEFENDANT:  Why am I here?

12             MR. COYLE:  The government will present other evidence

13   to establish this case, but it seems like the whole fabric of

14   what this difference is about is a misunderstanding about what

15   the testimony will even be, and it sounds like, under that

16   understanding, the defendant has no problem with this.

17             THE DEFENDANT:  You just said, on record, that you

18   will ask if fraud took place at the bank, and it doesn't

19   concern Mr. Wells.  So if something took place at the bank and

20   it does not --

21             THE COURT:  He didn't say that.  Mr. Wells, that's not

22   what he said.  What he said was that this particular witness

23   that you were concerned with was not tying it to you.  That's a

24   different question.  He wasn't saying that overall it wasn't

25   tied to you.  They are going to call a whole bunch of other

1    witnesses who they say will show that it was tied to you and

2    they will be cross-examined and so forth.  He was just talking

3    about one witness, so please don't overstate what he said.

4            Now my question is, given what he said about that one

5    witness, are you now prepared to have your counsel proceed to

6    trial?

7            THE DEFENDANT:  Before we proceed, can you please

8    reiterate, clarify --

9            THE COURT:  I'll let him do that.

10           MR. COYLE:  Biviana Jesurum's testimony will not offer

11   hearsay statements.

12           THE DEFENDANT:  Or the picture.  Continue.

13           MR. COYLE:  From Faith Brewster.

14           THE DEFENDANT:  Or the picture.  Or the picture.  Say

15   it.

16           MR. COYLE:  It will not give Mr. Wells' phone number.

17           THE COURT:  If the picture is your only concern, I'm

18   inclined to rule out the picture anyway, because I think that

19   might open the door.

20           MR. COYLE:  It won't include the picture.  There will

21   be nothing tying that teller --

22           THE COURT:  It won't include the picture.  Are you now

23   prepared to go forward with your counsel giving their defense?

24           THE DEFENDANT:  Yes.

25           MR. McGORTY:  Can I explain what the question is, your

 1    Honor?

 2              THE COURT:  He just said yes.  That was an unequivocal

 3    yes.  Let's get the jury panel.  Let's get going.

 4              MR. McGORTY:  Your Honor, that's fine.  If you think

 5    that's sufficient, I have no problem with that.  We should make

 6    clear what he said yes to.

 7              THE COURT:  What I understood, Mr. Wells, but correct

 8    me if I'm wrong, is, as a result of what you have now heard

 9    from the government about this particular witness, including

10    the Court's determination to keep the photograph out.

11              THE DEFENDANT:  The phone number, the name.

12              THE COURT:  He said they are not going to offer the

13    phone number and the name for this witness.  We are not talking

14    about any other witness.  And I'm saying that the witness also

15    can't offer the photograph.

16              With that knowledge, are you now prepared to have your

17    current counsel represent you at this trial and give up any

18    claims of conflict?

19              THE DEFENDANT:  Yes.

20              THE COURT:  Very good.  Let's get the jury.

21              THE DEFENDANT:  We don't have Biviana Jesurum.

22              THE COURT:  Let's get the jury, please.

23              Maybe you guys don't need a break, but I do.  We will

24    take a five-minute break at this point.

25              (Recess)

```
 1                        AFTERNOON SESSION

 2                           1:55 p.m.

 3           THE COURT:  We are missing one juror.  I am not sure

 4   what happened since they were all due back at 1:40.  But we

 5   will wait five more minutes and then if the juror is not here,

 6   we will maybe seat an alternate in their place.

 7           MS. ROTHMAN:  Your Honor, while we wait, if I can

 8   raise one small thing with respect to juror number 11.  That

 9   was the individual who said he knew a few members of the U.S.

10   Attorney's Office, including AUSA Rob Sobelman.

11           I did want to flag for the Court and for defense

12   counsel that I expect Mr. Sobelman to be in the courtroom

13   during various parts of the trial.  He is the supervisor of the

14   unit in which this case was charged.  There was no request to

15   strike that juror.  We don't think there is a basis to do so.

16   But I did want to put that on the record, your Honor.

17           THE COURT:  The supervisor, your supervisor, is

18   coming.  Is that to intimidate you, make you nervous and

19   stressed out?

20           MS. ROTHMAN:  He's not my supervisor, but he is for

21   Mr. Coyle and Ms. Cheng, your Honor.

22           THE COURT:  I think it is unnecessary pressure, but

23   OK.

24           MR. McGORTY:  Your Honor, Mr. Wells asked me, despite

25   the peremptory conversation we had earlier, he does want that
```

1    individual as a juror because of that relationship, which was

2    clear on the record.

3         THE COURT:  You had ten challenges to strike that

4    juror.

5         THE DEFENDANT:  That was not clear.

6         THE COURT:  Mr. Wells, now that the trial is underway,

7    I am not going to hear you volunteering anything.  If you want

8    to speak, speak to your attorney, who will bring it to my

9    attention.  Any more from you and I will take action you won't

10   care for.

11        MR. McGORTY:  Your Honor, the only other thing I would

12   add on that point, the fact that juror number 11 had

13   friendships in the U.S. Attorney's Office was clear.  The new

14   information, in fairness to Mr. Wells, is that that person is

15   supervising this prosecution and will be present.  That is a

16   new piece of information, in fairness to Mr. Wells.

17        THE COURT:  If you want, I will instruct that juror,

18   although I'm sure that juror already understands, to have no

19   contact with anyone from the U.S. Attorney's Office during the

20   duration of this trial.

21        As I said, he said he could be fair and impartial.  I

22   have every reason to believe he could be fair and impartial.  I

23   did not see that there was a basis for excusing him for cause.

24   I still do not see a basis for excusing him for cause.  But, in

25   addition, defendant had ten challenges, and he chose not to

1    challenge that, and I don't think the new information changes

2    the equation.

3          But what I will do is inquire or direct the juror --

4    we are still missing number 12.  Would you ask juror number 11

5    to come to the sidebar, please, and, counsel, please come to

6    the sidebar.

7          MS. ROTHMAN:  Your Honor, one other thing.  We are

8    happy to have Mr. Sobelman not come to watch the court

9    proceeding.

10         THE COURT:  Deprive him of this opportunity.  My

11   understanding is, he is bringing a little pad to grade you.

12   But, OK.  Is he here in the courtroom now?

13         MS. ROTHMAN:  Yes.

14         THE COURT:  There he is, looking very distinguished.

15   He has much more gray hair than any other AUSA I have ever

16   seen.

17         Would you mind vacating the premises.  And don't come

18   back.

19         (At the sidebar; juror present)

20         THE COURT:  You had mentioned that you had been

21   friends with various people at the U.S. Attorney's Office.  I'm

22   sure this is obvious to you, given your present position as a

23   lawyer in the appeals division of the state.  You should not

24   have contact with any AUSA in any way, shape, or form during

25   the course of this trial.

1              Do you understand that?

2              JUROR:  Yes.

3              THE COURT:  Very good.

4              MR. McGORTY:  While we are at sidebar, can we put in a

5    request for the transcript under CJA funds.  Making a request

6    for the daily transcript.

7              THE COURT:  That's fine.

8              MR. McGORTY:  Thank you.

9              (In open court)

10             THE COURT:  We are still missing juror number 12,

11   which is odd.  It's one thing for jurors to be late coming into

12   court, because of the transportation issues or whatever.

13             Still missing, Linda?

14             My inclination, but let me hear from counsel, is to

15   excuse that juror and replace that juror with alternate number

16   1.  It is now almost 25 minutes that she was due back.  I am

17   sure it's some innocent reason or whatever.  We have already

18   had delays.  We need to keep this trial moving, in fairness to

19   all the other jurors.

20             THE DEPUTY CLERK:  She is here.

21             THE COURT:  The issue becomes moot, but I will say

22   something at the end of the day to the jurors about promptness

23   in the future.

24             THE DEPUTY CLERK:  May I bring in the jury?

25             THE COURT:  Please.  All of them.

1          (Jury present)

2          THE COURT:  Ladies and gentlemen, we are now going to

3  hear opening statements from counsel for each side.  I want to

4  emphasize that nothing that counsel says is evidence.  The

5  evidence will come from the witnesses, from the exhibits, and

6  there may be stipulations.  Those are the only three sources of

7  evidence.

8          Why do we even have opening statements?  The answer

9  is, the evidence will come in one little bit at a time, and,

10  therefore, it may be helpful to you to have an overview of what

11  each side thinks the evidence will show or fail to show as the

12  case may be.  They are obviously going to have different views,

13  but it may be helpful to hear what their views are to help you

14  focus on the issues in the case.

15          As you will recall, the government bears the burden to

16  prove the defendant guilty beyond a reasonable doubt, and I

17  will give you instructions later on as to what is meant by

18  beyond a reasonable doubt.  But because they bear the burden of

19  proof they go first, so we will hear now from the government.

20          MR. COYLE:  This is a case about a man who stole

21  people's identities and used those identities to steal money

22  from banks.  The defendant, Laurell Wells, ran a scheme to cash

23  fake checks in the names of real people and real businesses.

24  He targeted dozens of banks and stole hundreds of thousands of

25  dollars.

1          And he didn't act alone.  He recruited others,

2   typically, women he was dating, to help him do it.  That's why

3   we are here today, because it's a federal crime to steal

4   people's identities and use those identities to steal money

5   from banks.

6          This is the government's opening statement.  It's an

7   opportunity to explain what we expect the evidence will show

8   and how we will prove to you that the defendant is guilty.

9          What will the evidence show?  You will learn that the

10  defendant's scheme was simple.  First, he got personal

11  information, like dates of birth, Social Security numbers, and

12  bank account numbers.  Second, he used that information to make

13  fake checks, fake money orders, and fake IDs.  And, third, he

14  used other people to cash those fake checks and money orders at

15  banks, then walk out with thousands of dollars in cash, money

16  that he had no right to.

17         How did the defendant get this personal information?

18  Insiders.

19         One insider was his girlfriend who worked at the

20  Department of Motor Vehicles.  She stole information from DMV

21  files, like dates of birth and signatures off a New York

22  driver's license, and she sent it to the defendant.

23         Other insiders worked at the banks.  They were trusted

24  to keep people's identities safe, but instead sent the

25  defendant information on bank customers, like account numbers

1   and pictures of checks.  The defendant then sent this

2   information to the other people who used it to make the fake

3   IDs, checks, and money orders.

4          The defendant then brought people to the banks.  He

5   gave the fake -- those people gave the fake IDs and the checks

6   to bank tellers, and they walked out with the cash, cash that

7   they handed right to the defendant, money that did not belong

8   to them and that did not belong to the defendant.

9          You'll learn that the defendant carried out a scheme

10  here in New York and at bank branches all across the country:

11  Iowa, Missouri, Alabama, Florida.  He ran the same playbook

12  over and over dozens of times.

13         You will learn about a time when the defendant used a

14  fake ID and fake check himself to commit fraud at a bank just

15  north of New York City.  At one bank he cashed a fake check

16  using a stolen identity and walked out with almost $4,000 in

17  his pocket.  He then tried to do the same thing at another bank

18  right around the corner, but the bank caught on to him and they

19  froze the account.

20         A few months later the defendant was arrested for

21  doing this.  And when he was caught he was carrying a fake ID

22  in the name of the bank customer he had impersonated to cash

23  that fake check.  That is what the evidence will show, that the

24  defendant recruited insiders to send him confidential

25  information that used fake ID checks and money orders to commit

1   fraud, that he used women to go in the banks to steal the

2   money, and even went in the banks to do it himself.

3           How will the government prove that the defendant is

4   guilty?

5           First, you'll see bank surveillance video and

6   photographs.  You will see video of the defendant in banks

7   trying to cash fake checks.  You will see photographs of the

8   women he recruited in dozens of banks handing fake checks and

9   money orders to tellers and walking out with thousands of

10  dollars in cash, cash they gave to the defendant.

11          Second, you'll see documents.  You'll see copies of

12  the fake checks and IDs used to steal money from the banks.

13  You'll see records, like a speeding ticket the defendant got

14  close to one of the banks and a hotel reservation he made in

15  the same area, evidence that even though the defendant didn't

16  often go into the banks himself, he was always nearby.

17          Third, you'll see the defendant's own words in dozens

18  of text messages, messages with a bank teller who sent him

19  check images and customer account information, messages where

20  the defendant sent that same information to his partner to make

21  the fake IDs and fake checks, messages with his girlfriend,

22  where she gave him dates of birth, images of signatures, and

23  other information from DMV files that he needed to make the

24  fake documents.

25          Finally, you will hear from witnesses.  You will hear

from a victim whose identity was stolen by the defendant.  She

will tell you about the morning she walked into work and

learned that someone had used her company's name to print fake

checks and steal thousands of dollars from her account.

You will hear from law enforcement officers, including

an investigator at the DMV.  He will tell you that he

discovered that the defendant's girlfriend searched for account

information in DMV's systems, information that she later texted

to the defendant, and you will hear from the women the

defendant used to commit these crimes.  They will come into

court and tell you that the defendant recruited them, that they

sent the defendant customer information or cashed fake checks

because the defendant asked them to and because he gave them

some of the money.

You will learn these women have entered into a

grievance with the government where they cannot be prosecuted

for their involvement in the scheme so long as they tell the

truth.

As you listen to their testimony, ask yourself if what

they say is backed up by all the other evidence at the trial,

evidence like the defendant's text messages, the surveillance

images from the bank, the DMV records and more.

After seeing all the evidence, you will know that the

defendant worked with others to steal from banks, and you will

know that he used people's stolen identities to do it.

1          At the end of the trial, we are going to have the

2     chance to speak to you again.  But between now and then I would

3     like you to do three things:  First, pay close attention to the

4     evidence; second, follow Judge Rakoff's instructions on the

5     law; and, third, use your common sense, the same common sense

6     you use every day.  If you do those three things, you will

7     reach the only verdict that is consistent with the evidence,

8     the law, and common sense, that the defendant, Laurell Wells,

9     is guilty.  Thank you.

10          THE COURT:  Thank you very much.

11          Now we will hear from defense counsel.

12          MR. CURRIE:  Thank you, your Honor.

13          Good afternoon, ladies and gentlemen.  Just before

14     lunch, before the judge excused you, you all stood, raised your

15     hand and took an oath to follow your duties and

16     responsibilities as jurors in this case, and of course you are

17     going to follow the judge's instructions, as you swore to do

18     so, and the judge explained that Mr. Wells, like every

19     defendant charged in the United States, is entitled to certain

20     fundamental protections.

21          One of them is the presumption of innocence.  That's a

22     safeguard, the presumption of innocence, that protects all of

23     us in the United States.  Everyone charged with a crime is

24     entitled to that presumption from the moment the trial begins

25     until the moment the jury reaches its conclusion in

1    deliberations.  You should imagine that that presumption stays

2    with Mr. Wells at the beginning of every session, at the end of

3    every session, and when we come back tomorrow morning and every

4    day of this trial, that presumption remains with them.

5          Now, another important principle that the judge

6    mentioned is the government's burden of proof.  The judge

7    explained that the government has a burden of proving beyond a

8    reasonable doubt every element of the crime charged.  Now, our

9    law intentionally makes that a heavy burden for the government.

10   The burden never shifts from the government to the defense.  As

11   you consider all of the evidence in this case, keep that in

12   mind, that the government maintains burden of proof.  The

13   defense has no burden to prove anything, no burden to put on

14   any evidence.  You will hear us question and challenge

15   evidence, but we have no burden of presenting evidence.

16         Let's talk about the evidence that you are going to

17   hear.  Now, some of the evidence you are going to hear, there

18   is going to be no dispute about that.  There is not going to be

19   a dispute that people went into banks and tried or successfully

20   cashed fraudulent checks, and you will hear from some of the

21   people who did that or some of the people who were inside a

22   bank providing information.

23         What the government won't be able to prove, what they

24   won't be able to convince you beyond a reasonable doubt is that

25   Mr. Wells had anything to do with those transactions.

1          The most important part of the government's case

2     relies on the testimony of people who committed crimes, who

3     committed check fraud themselves, and who are going to appear

4     before you and testify.  They will testify about their own

5     wrongdoing.

6          As you consider that, as you consider that evidence of

7     these witnesses, you should appropriately be skeptical.  These

8     are people with their own motivations.  They have a motivation

9     to, I submit, maintain the favor of the government, because the

10    government has agreed that they don't get charged.  They get

11    off.  Nothing happens to them by the prosecution.  That, I

12    submit, is a motive you must consider very carefully as you

13    evaluate their evidence.

14         Now, one thing that we agree with, Mr. Coyle asked

15    everyone to apply their common sense.  We agree.  It's really

16    important.  And as you evaluate the evidence in this case,

17    apply your common sense, especially to these witnesses who are

18    involved in check fraud themselves.  Apply your common sense to

19    evaluate what is their motivation to testify in this case, what

20    is their motivation to testify in the way that they do testify,

21    and does that square with your common sense.

22         At the end of the case, we will have an opportunity to

23    speak to you again, and we submit that what you will determine

24    after you get together and consider all of the evidence and

25    discuss it among yourselves is that the government will have

1    failed to meet its burden, that heavy burden of determining --

2    of proving to you, satisfying to you that they proved every

3    element of every crime charged in this case beyond a reasonable

4    doubt.

5              Thank you for your attention.

6              THE COURT:  Thank you very much.

7              The government will call their first witness.

8              MS. CHENG:  The government calls Esther Sandrof to the

9    stand.

10   ESTHER SANDROF,

11        called as a witness by the government,

12        having been duly sworn, testified as follows:

13   DIRECT EXAMINATION

14   BY MS. CHENG:

15   Q.  Ms. Sand, where do you work?

16   A.  I work at Forsyth Street Advisors.

17   Q.  Where is the company located?

18   A.  It's located at 588 Broadway in New York.

19   Q.  What borough is that?

20   A.  In Manhattan.

21   Q.  What does the company do?

22   A.  We help to finance affordable housing.

23   Q.  Approximately how many people work at Forsyth?

24   A.  About 18 employees.

25   Q.  What's your role at Forsyth Street Advisors?

```
 1   A.  My title is chief operating officer, so I manage the
 2   administrative functions of the office.  I'm also a consultant
 3   in the company.
 4   Q.  How long have you worked at the company?
 5   A.  I'm a cofounder.  We founded the company in 2003.
 6   Q.  What are your responsibilities as the chief operations
 7   officer?
 8   A.  I manage the administrative functions in the company, which
 9   includes accounts payable, accounts receivable, and payroll
10   benefits and the pension fund.
11   Q.  Would your financial responsibilities for the firm involve
12   issuing or handling checks issued by the firm?
13   A.  Yes.
14   Q.  Based on your role at Forsyth, are you familiar with the
15   vendors or other service providers that the firm uses?
16   A.  I am.
17   Q.  Are you familiar with the clients that the firm has?
18   A.  I am.
19   Q.  I'd like to direct your attention to January of 2018.  Were
20   you involved in the firm's bookkeeping at that time?
21   A.  I was.
22   Q.  In January of 2018, did you receive a bank notification
23   concerning Forsyth's bank account at that time?
24   A.  Yes.
25   Q.  Where were you when you received that notification?
```

1    A.   I was in the office.

2    Q.   Where was the office located?

3    A.   588 Broadway in New York.

4    Q.   Was that the office in Manhattan you just spoke about a few

5    moments ago?

6    A.   Yes, same office.

7    Q.   What bank did you receive the notification from?

8    A.   Chase Manhattan Bank.

9    Q.   Did Forsyth have a bank account with Chase Manhattan at the

10   time?

11   A.   Yes.

12   Q.   What kind of account was it?

13   A.   It was a checking account.

14   Q.   Where did Forsyth first open that account with Chase?

15   A.   We opened the account in midtown when we formed the firm in

16   2003, so we had the account since then.

17   Q.   Just to clarify, when you refer to midtown, what do you

18   mean?

19   A.   When we opened the firm, our offices were located for about

20   a year in the east 40s.  So we opened the account at a branch

21   in the east 40s.  But after that, we moved down to Soho in

22   2004.

23   Q.   Are all these locations that you have just mentioned in

24   Manhattan?

25   A.   Yes.

1  Q.  After you received the notification from Chase, what's the

2  first thing you did?

3  A.  I got together with our administrative staff members, and

4  we contacted our bookkeeper to figure out -- to look at the

5  account and confirm what the bank had said -- the bank had said

6  that they thought that there was some fraud in our account, and

7  we needed to check and confirm with them.  So we checked and we

8  confirmed that the checks that had been written were not

9  written by anybody in our office.

10 Q.  Did you identify any unauthorized payments that were drawn

11 from Forsyth's Chase checking account?

12 A.  There were checks written.  The money was never taken from

13 the account because the bank identified the fraud before the

14 money could be withdrawn from the account.

15 Q.  How many check transactions were unauthorized?

16 A.  There were four checks.

17 Q.  Do you know what Forsyth checks looked like in November and

18 December of 2017?

19 A.  Yes, I do.

20 Q.  How do you know what those checks looked like?

21 A.  The checks that we issued?

22 Q.  How did you gain familiarity with what Forsyth checks

23 looked like during the time period of November and December of

24 2017?

25 A.  I was a signator on the account.

1          MS. CHENG:  With Mr. Santello's assistance, I'd like

2     to pull up just for the witness what has been marked for

3     identification as Government Exhibit 301A.  It's just for the

4     witness, please.

5          Your Honor, with your permission, at this time I would

6     like to read a stipulation into the record.

7          THE COURT:  OK.

8          MS. CHENG:  This is from Government Exhibit 1005.

9          "It is hereby stipulated and agreed, by and among the

10    United States of America, by and through the undersigned

11    Assistant United States Attorneys and Laurell Wells, the

12    defendant, by and through his undersigned counsel that:

13         1.  Government Exhibits 301 through 306 and 308,

14    including their subparts, are true and correct copies of

15    records produced by JP Morgan Chase Bank NA.

16         2.  Government Exhibits 401 through 430, including

17    their subparts, are true and correct copies of records produced

18    by Regions Bank.

19         3.  Government Exhibit 609 is a true and correct copy

20    of surveillance footage from an M&T Bank branch in Rye Brook,

21    New York recorded on March 27, 2019.  Subpart A:  Government

22    Exhibits 609A through 609H are screenshots from Government

23    Exhibit 609.

24         4.  Government Exhibit 608 is a true and correct copy

25    of surveillance footage from an M&T Bank branch in Cos Cob,

Connecticut, recorded on March 29, 2019.  Subpart A.:

Government Exhibits 608A through 608D are screenshots from

Government Exhibit 608.

5.  Government Exhibits 601 through 607 are true and

correct copies of records produced by M&T Bank.

6.  The original records for the information contained

in Government Exhibits 301 through 306 and 308, including their

subparts in, 401 through 430, including their subparts, and 601

through 609, including their subparts, are records of regularly

conducted activity that were made at or near the time of the

occurrence of the matters set forth in the record by or from

information transmitted by a person with knowledge of the

matter set forth in the records, were kept in the course of the

regularly conducted business activity, and it was a regular

practice of that activity to make the records.

It is further stipulated and agreed that this

stipulation, marked as Government Exhibit 1005, may be received

in evidence as a government exhibit at trial.

At this point the government offers all of the

referenced exhibits from this stipulation, as well as the

stipulation itself, into evidence.

THE COURT:  Received.

(Government Exhibits 1005, 301-306, 308, including

their subparts, 401-430, including their subparts, 609,

609A-609H, 608, 608A-608D, 601-607 received in evidence)

 1          MS. CHENG:  Your Honor, may I publish Government

 2   Exhibit 301A to the jury?

 3          THE COURT:  Yes.

 4          MS. CHENG:  Mr. Santello, can you publish 301A to the

 5   jury.  Can you not highlight this particular part yet.  I would

 6   like to show the witness the full document.

 7          Can you scroll through.

 8          Can we turn back to the next page, please.

 9   Q.  Ms. Sandrof, what is this document?

10   A.  It's a copy of the check -- of one of the checks.

11          MS. CHENG:  At this time, Mr. Santello, can you blow

12   up the image of the check on this first page.

13   Q.  Directing your attention to the first check of this

14   exhibit, who is listed as the issuer of the four checks?

15   A.  It says Forsyth Street Advisors LLC.

16   Q.  Is that the name of your company?

17   A.  It is the name of our company, yes.

18   Q.  Who are these checks paid out to?

19   A.  Sandra Mendieta.

20   Q.  Do you know who Sandra Mendieta is?

21   A.  No.

22   Q.  Does she work at Forsyth?

23   A.  No.

24   Q.  Is she a client of Forsyth?

25   A.  No.

1    Q.  Is she associated with any vendors did that provides

2    services to Forsyth?

3    A.  Not that I know of.

4    Q.  Below her name in is an address.  Is that address

5    associated with Forsyth?

6    A.  No.

7    Q.  Is that address associated with any clients of Forsyth?

8    A.  No.

9           MS. CHENG:  Mr. Santello, can we return back to the

10   full-size image of the first page.

11   Q.  Taking a look at the first page of this document, what date

12   was this check cashed?

13   A.  It was issued on 12/15/2017.

14          THE COURT:  I'm sorry.  You need to get closer to the

15   microphone.

16   A.  I'm sorry.  My eyesight is not very good.  The date on the

17   check is 12/15/2017.

18   Q.  Can you see when this check was cashed.

19   A.  I am not sure how to read checks in that way.  The posting

20   date says 12/29/2017.  Is that what you mean?

21   Q.  Yes.  Thank you.

22          MS. CHENG:  Can we return back to the full-size image

23   of the first page.

24          Can we turn to the second page.

25          Can we blow up the image of the check.

1    Q.  Who is this check made out to?

2    A.  Sandra Mendieta.

3    Q.  Is that the payee of the prior check as well?

4    A.  Yes.

5    Q.  Who is the issuer of this check?

6    A.  Forsyth Street Advisors LLC it says.

7            MS. CHENG:  Can we return back to the full-size image

8    of this page.

9    Q.  You see what date this check was cashed.

10   A.  December 29, 2017.

11           MS. CHENG:  Can we move to the third page.  Can you

12   blow up the image of the check, please.

13   Q.  Who is the payee listed for this check?

14   A.  Sandra Mendieta.

15   Q.  Who is the payor listed for this check?

16   A.  Forsyth Street Advisors LLC.

17           MS. CHENG:  Can we return back to the full-size image

18   of this page.

19   Q.  What was the date that this check was cashed?

20   A.  December 29, 2017.

21           MS. CHENG:  Let's turn to the last page, page 4.

22           Can you blow up the image of the check.

23   Q.  Who is this check made out to?

24   A.  Sandra Mendieta.

25   Q.  Who is the payor on this check?

1    A.  Forsyth Street Advisors LLC.

2              MS. CHENG:  Can we return to the full-size image of

3    the page.

4    Q.  What was the date that this check was cashed?

5    A.  December 29, 2017.

6    Q.  Were all four of these checks cashed on the same date?

7    A.  It appears so, yes.

8    Q.  Were they all listing Forsyth Street Advisors as the payor?

9    A.  Yes.

10   Q.  They all listed Sandra Mendieta as the payee?

11   A.  Yes.

12             MS. CHENG:  Let's turn back to the first page, please.

13   Q.  When you reviewed these four checks, did they appear to you

14   to be genuine checks of the firm?

15   A.  No.

16   Q.  I'd like to direct your attention to specific features of

17   the check.  We will use the first one as an example.  Do you

18   see the logo that's in the center top of the top image of the

19   check?

20   A.  Yes.

21             (Continued on next page)

22

23

24

25

1    BY MS. CHENG:

2    Q.  Did the four checks include this logo?

3    A.  No.

4    Q.  I'd like to direct your attention to the upper right corner

5    of the check.  Do you see that check number?

6    A.  Yes.

7    Q.  Was this check number correct?

8    A.  No.  We were about 5300 at that time.

9    Q.  Can you explain what you mean by that?

10   A.  The checks have numbers on them in sequence and this check

11   has a number that's completely out of sequence with the checks

12   that we were issuing at that time.

13   Q.  Did all four of the checks we just looked at have these

14   features that you identified the check being out of sequence

15   and this logo that doesn't appear on genuine Forsyth checks?

16   A.  Yes.

17            MS. CHENG:  I'd like to direct your attention to about

18   the middle of the page where you see the account number on the

19   check.

20            So, I think if you would highlight just the right most

21   collection of documents that we've highlighted, Mr. Santello.

22            (Pause).

23   Q.  Do you see that?

24   A.  Yes.

25   Q.  Is that the correct account number Forsyth Advisers?

 1    A.   Yes.

 2              MS. CHENG:   Can we return back to the full size image

 3    of page one.

 4              (Pause)

 5    Q.   Did your firm authorize any of these four checks?

 6    A.   No.

 7    Q.   Did your firm authorize the use of Forsyth's name and

 8    account number on any of these four checks?

 9    A.   No.

10    Q.   After you learned that there were these four unauthorized

11    checks, did Forsyth continue to use this particular Chase Bank

12    account?

13    A.   The bank advised us that we need to shut down the account

14    and open a new checking account.

15    Q.   Now I believe you testified earlier that Forsyth did not

16    lose money as a result of the processing of these four fake

17    checks; is that right?

18    A.   That's correct.

19    Q.   Why not?

20    A.   The bank caught the fraud before the money had been drawn

21    from our account.   So, there were no deductions from our

22    account based on these checks.

23    Q.   Setting aside the dollar amount of the checks, did the firm

24    incur any other costs due to the fact that this checking

25    account information had been used in an unauthorized manner on

1    those four checks we just saw?

2    A.   There were costs related to disruption of having to create

3    a new checking account because our payroll and all of our --

4    had to be switched over and we had to instruct our clients that

5    we had a new account number because we often get paid

6    electronically and so they had to contact all of our clients

7    and vendors.  So it involved a lot of work from our

8    administrative staff and our bookkeeper to make everything

9    right again, particularly, before the next payroll which was on

10   the 15th of January, 2018.

11   Q.   Approximately, how long did it take Forsyth to fully

12   transition from this prior Chase Bank account to a new account?

13   A.   Took approximately three months, I would say.

14   Q.   Also, you mentioned that the firm, your firm did not lose

15   the dollar value that we saw on these four checks but do you

16   know whether or not Chase Bank lost the money from those four

17   checks?

18           MS. GIFFUNI:  Objection, your Honor.

19           THE COURT:  Given the answer, it is probably mute but

20   I'll sustain the objection.

21           MS. CHENG:  If I could have a moment please, your

22   Honor?

23           THE COURT:  Yes.

24           (Pause)

25           MS. CHENG:  Thank you.  No further questions.

 1              THE COURT:  Cross-examination?

 2    CROSS-EXAMINATION

 3    BY MS. GIFFUNI:

 4    Q.  Good afternoon, Ms. Sandrof.

 5              You met with the government on more than one occasion

 6    to prepare for your testimony here today?

 7    A.  Yes.

 8    Q.  You met with them on two occasions and you had a call with

 9    them on a third occasion; is that correct?

10    A.  Yes.

11    Q.  Okay.  And before the government showed you the checks or

12    those four checks in the meetings, you had never seen those

13    checks before the four checks you testified about?

14    A.  The bank had sent us copies of the checks at the time so we

15    could confirm that they were not our checks.

16    Q.  You had told the government in a meeting that you don't

17    recall ever seeing those checks or even knowing that it was a

18    check based fraud, correct?

19              MS. CHENG:  Objection.

20              THE COURT:  Sustained as to form.  There are ways to

21    ask that.

22              MS. GIFFUNI:  Thank you, your Honor.

23    Q.  You don't know who tried to cash those checks at Chase

24    Bank, do you?

25    A.  No.

1    Q.  You have no idea how the fraud was actually perpetrated

2    against your account, correct?

3    A.  No.

4    Q.  And independent of what the government may have told you,

5    you have no idea who perpetrated the account against Forsyth's

6    account, correct?

7            MS. CHENG:  Objection to form.

8            THE COURT:  Well, I think the objection is valid only

9    because of the preface, but to the extent it is not already

10   been asked and answered, you can ask the latter part of that

11   question.

12           MS. GIFFUNI:  Thank you, your Honor.

13   Q.  You have no idea who perpetrated the fraud against

14   Forsyth's account, correct?

15   A.  Correct.

16   Q.  And you mentioned on direct that you were reimbursed and

17   you never saw a monetary loss to your bank account?

18   A.  To our bank, yes.

19           MS. GIFFUNI:  No further questions.

20           THE COURT:  Any redirect?

21           MS. CHENG:  No, your Honor.

22           THE COURT:  Call your next witness.

23           MR. COYLE:  Your Honor, the government calls Summer

24   Robins.

25           Your Honor, may we set up a face board in the well of

```
 1     the courtroom?

 2              THE COURT:  Yes.

 3              (Pause)

 4              THE COURT:  Go ahead.

 5              MR. COYLE:  Your Honor, does the witness need to be

 6     sworn-in?

 7              Please rise and raise your right hand.

 8      SUMMER ROBBINS,

 9          called as a witness by the Government,

10          having been duly sworn, testified as follows:

11              THE COURT:  Please state your name and spell it for

12     the record.

13              THE WITNESS:  Summer Robbins, S-u-m-m-e-r,

14     R-o-b-b-i-n-s.

15              THE COURT:  Counsel.

16              MR. COYLE:  Thank you.

17     DIRECT EXAMINATION

18     BY MR. COYLE:

19     Q.  Good afternoon, Ms. Robins.

20              How old are you?

21     A.  Thirty-five.

22     Q.  And are you currently employed?

23     A.  I am.

24     Q.  Where do you work?

25     A.  I work in radiology.
```

1    Q.   What do you do there?

2    A.   Administrative support.

3    Q.   Directing your attention to December of 2017, did there

4    come a time when you participated in a bank fraud scheme?

5    A.   Yes.

6    Q.   At which bank did you commit fraud?

7    A.   Chase.

8    Q.   What did you do as part of your involvement in the scheme?

9    A.   I endorsed and cashed checks that weren't made out to me.

10   Q.   Did you know those checks to be fake?

11   A.   Yes.

12   Q.   When you cashed the fake checks at Chase, were you acting

13   alone or with other people?

14   A.   With others.

15   Q.   Who were you working with?

16   A.   Laurell Wells.

17   Q.   Do you see Laurell Wells in the courtroom today?

18   A.   Yes, I do.

19   Q.   Can you please identify him by an article of clothing he is

20   wearing and where he is seated?

21   A.   A yellow top and right here.

22             MR. COYLE:   Let the record reflect at witness has

23   identified the defendant, Mr. Laurell Wells.

24             THE COURT:   Yes.

25             MR. COYLE:   Mr. Santello, can you please pull up

1    what's been marked for identification as Government Exhibit

2    one.

3              (Pause)

4    Q.  Ms. Robbins, do you recognize this photo?

5    A.  Yes, I do.

6    Q.  Who is this a photo of?

7    A.  Laurell.

8    Q.  Is this a fair and accurate photo of the defendant?

9    A.  Yes, it is.

10             MR. COYLE:  The government offers Government Exhibit

11   one into evidence.

12             MR. MCGORTY:  No objection.

13             THE COURT:  Received.

14             MR. COYLE:  May we publish to the jury?

15             THE COURT:  Yes.

16             (Pause)

17             MR. COYLE:  Thank you.  You can take that down.

18             Mr. Santello, please pull up Government Exhibit Three.

19             (Pause)

20             MR. COYLE:  What has been marked for identification as

21   Government Exhibit Three.  My apologies.

22   Q.  Do you recognize this photo, Ms. Robbins?

23   A.  Yes, I do.

24   Q.  Who is this a photo of?

25   A.  Me.

 1              MR. COYLE:  The government offers Government Exhibit

 2    three into evidence.

 3              MR. MCGORTY:  No objection.

 4              THE COURT:  Received.

 5              (Government's Exhibit Three received in evidence)

 6              MR. COYLE:  May we publish to the jury?

 7              THE COURT:  Yes.

 8              (Pause)

 9              MR. COYLE:  Thank you.  You can take that down.

10    Q.  Ms. Robbins, when you first met the defendant, what did he

11    say his name was?

12    A.  Corey.

13              MR. COYLE:  Your Honor, may we publish Government

14    Exhibit One and Government Exhibit Three to the face board and

15    add the nameplate "Corey" and "Laurell Wells" under the

16    defendant's photograph?

17              THE COURT:  Yes.

18              (Pause)

19    Q.  Let's start at the beginning, Ms. Robbins.

20              How did you meet the defendant?

21    A.  I met him driving on the Bruckner Expressway in the Bronx.

22    Q.  How did you meet as you were driving?

23    A.  Well, first I noticed his car and then we ended up at a

24    stoplight together where he had waived me down and we exchanged

25    names and numbers.

1   Q.   And at that time, what did he say his name was?

2   A.   "Corey".

3   Q.   And you said you exchanged phone numbers?

4   A.   Yes, we did.

5   Q.   And you said he was driving a particular vehicle,

6   obviously, on the Bruckner?

7   A.   Yes.

8           MR. COYLE:  Mr. Santello, can you please pull up for

9   the witness what's been marked for identification as Government

10  Exhibits 201 and Government Exhibit 202.

11          (Pause)

12  Q.   Ms. Robbins, do you recognize the vehicle in these photos?

13  A.   I do.

14  Q.   Whose vehicle is it?

15  A.   Laurell.

16  Q.   Is that the vehicle he was driving when you met him on the

17  Bruckner?

18  A.   Yes, it was.

19          MR. COYLE:  The government offers Government Exhibits

20  201 and 202 into evidence.

21          MR. MCGORTY:  No objection, your Honor.

22          THE COURT:  Received.

23          (Government's Exhibits 201 and 202 received in

24  evidence)

25          MR. COYLE:  May we publish to the jury?

```
 1            THE COURT:  Yes.
 2            (Pause)
 3   Q.  Can you describe what the vehicle looked like that the
 4   defendant was driving that day you met him?
 5   A.  It was a foiled Audi with mirrors.  You could see your
 6   reflection in it.
 7   Q.  Is that why you took notice of the car when he was driving?
 8   A.  Yes.
 9   Q.  And you said you exchanged phone numbers with the defendant
10   that day, correct?
11   A.  Yes.
12   Q.  So after you met him when driving, when did you next speak
13   with the defendant?
14   A.  Later on that day.
15   Q.  What did you talk about?
16   A.  Just I guess normal things when you are meeting someone for
17   the first time, like dating, conversations, like what do you
18   like and what do you do for fun?
19   Q.  And did there come a time when you met the defendant in
20   person?
21   A.  Yes.
22   Q.  Approximately, how long after you first met him on the
23   Bruckner Expressway was that?
24   A.  A few days.
25   Q.  Do you remember where you met him?
```

 1   A.   In the Bronx.

 2   Q.   And after you met him that first time did you see each

 3   other often?

 4   A.   We saw each other maybe like a couple days a week.

 5   Q.   What types things would you and the defendant do together?

 6   A.   We would have dinner together.  We took a trip to Atlantic

 7   City to Connecticut.

 8   Q.   How would you describe the nature of your relationship with

 9   the defendant at that time?

10   A.   I thought I was getting to know him romantically.

11   Q.   You mentioned that you took a few trips with the defendant,

12   correct?

13   A.   Yes.

14   Q.   I think I heard you say "Atlantic City" and "Connecticut";

15   is that right?

16   A.   Yes.

17   Q.   Why don't we start with Atlantic City.  Do you remember how

18   often after you met the defendant or -- I'm sorry.  How long

19   after you met the defendant you took that trip?

20   A.   I would say like maybe a week or two.

21   Q.   Do you remember what you did there?

22   A.   We went to a casino.

23   Q.   What was the name of the casino?

24   A.   The Golden Nugget.

25   Q.   What did you do at the casino?

```
 1   A.  We checked in.  They had a hotel.  We checked into the

 2   room.  We went down to the casino for, where Laurell gambled.

 3   Q.  Did you book the hotel room or did the defendant?

 4   A.  I did not.

 5   Q.  When you traveled down to Atlantic City do you remember how

 6   you got there?

 7   A.  Yes.

 8   Q.  How is that?

 9   A.  He drove.

10   Q.  What car did he drive?

11   A.  His.

12   Q.  His car.  Is that the Audi you mentioned before?

13   A.  Yes.

14   Q.  Then you mentioned another trip to Connecticut.  What did

15   you do on that trip?

16   A.  We went to a wine spot and had dinner.

17   Q.  Did you stay overnight?

18   A.  No, we did not.

19   Q.  You testified that you participated in bank fraud with the

20   defendant, correct?

21   A.  Yes.

22   Q.  How did that come about?

23   A.  Laurell had approached me about it and pretty much told me

24   that I wouldn't get in trouble, like I would get away with it.

25   It was going to be very easy.
```

1    Q.   What did he ask you to do?

2    A.   He asked me to go into Chase and to endorse checks and to

3    cash them.

4    Q.   This first time when the defendant asked you to do that,

5    how did you respond?

6    A.   I was like, absolutely not.

7    Q.   Why didn't you agree right away?

8    A.   Because I knew it was a crime.

9    Q.   Did he ask you again?

10   A.   Yes, he did.

11   Q.   You said you did eventually participate, right?

12   A.   Yes, I did.

13   Q.   How many times did he ask you before you agreed?

14   A.   About two or three times.

15   Q.   So, on the day you agreed to actually help the defendant

16   commit fraud, how did that happen?

17   A.   Well, Laurell was very persuasive in asking me to help him.

18   He told me that all I had to do was go into the bank and cash

19   the checks and it would be easy and I would make money from it.

20           THE COURT:   When you say "cash the checks", these were

21   checks made out to someone else than you?

22           THE WITNESS:   Yes.

23           THE COURT:   All right.  Go ahead.

24   Q.   Did you know that what you were going to do was going to be

25   illegal?

```
 1   A.  Yes, I did.

 2   Q.  Ms. Robbins, why did you agree to participate?

 3          MR. MCGORTY:  Object to the relevance, your Honor.

 4          THE COURT:  No.  I think it goes to credibility.

 5          Overruled.

 6   A.  I agreed to cash the checks.  He was persuasive but at the

 7   same time I was kind of starting life over just starting from

 8   scratch.  I didn't want to ask my parents for money so I

 9   agreed.

10   Q.  Did you understand you would receive any money?

11   A.  Yes, I did.

12   Q.  Why did you understand that?

13   A.  Because he told me that I would.

14   Q.  How much did he say you'd make?

15   A.  Five hundred dollars.

16   Q.  I want to talk about that time you cashed the checks in

17   detail.  Where was the bank located?

18   A.  It was located in Brooklyn on Flatbush Avenue by Grand Army

19   Plaza.

20          MR. COYLE:  Mr. Santello, can you please pull up for

21   the witness what has been marked for identification as

22   Government Exhibit 203, please.

23          (Pause)

24   Q.  Do you recognize what's shown in this photo?

25   A.  I do.
```

1   Q.  What's this a photograph of?

2   A.  The bank that I cashed the checks in.

3          MR. COYLE:  The government offers Government Exhibit

4   203 into evidence.

5          THE COURT:  Any objection?

6          MR. MCGORTY:  No objection, your Honor.

7          THE COURT:  Received.

8          (Government's Exhibit 203 received in evidence)

9          MR. COYLE:  May we publish to the jury, please?

10         THE COURT:  Yes.

11         (Pause)

12  Q.  How did you get to the bank that day?

13  A.  Laurell drove me.

14  Q.  What, if anything, did the defendant give you before you

15  went in?

16  A.  He gave me checks, an ID and a bank card.

17  Q.  Did he give you any instructions for when you went in the

18  bank?

19  A.  Yes, he did.

20  Q.  What did he tell you to do?

21  A.  He told me that I needed to go to a specific teller.  It

22  was a young black woman, to only go to her and she would cash

23  the checks.

24  Q.  Did he tell you why he wanted you to go to that teller?

25  A.  Because she was working with him.

1   Q.  What do you mean "working with him"?

2   A.  That they had some type of arrangement.

3   Q.  Just to be clear, those checks and the ID he gave you to

4   cash or -- sorry -- the checks he gave you to cash and the ID

5   he gave you to use, were those in your name?

6   A.  No, they were not.

7   Q.  You understand them to be fake?

8   A.  Yes, I did.

9   Q.  I think you did this a little bit but did he describe the

10  teller he wanted you to go to?

11  A.  Yes, he did.

12  Q.  How did he describe her to you?

13  A.  That she was a young black girl.

14  Q.  Did he tell you anything else about her?

15  A.  Yes, he did.

16  Q.  What was that?

17  A.  He told me that she was about 20/21.  It was her first job

18  working at the bank and she had a young baby at home and she

19  was working with him, that he would give her things like beats

20  or headphones and stuff like that.

21  Q.  Did you say you were supposed to receive money from the

22  defendant after you cashed these checks?

23  A.  Yes.

24  Q.  How much?

25  A.  Five hundred dollars.

1    Q.  The day you went into the bank, do you remember what you

2    were wearing?

3    A.  Yes, I do.

4    Q.  What was that?

5    A.  I was wearing a hot pink hat, a pink fur coat.

6    Q.  Can you tell us what happened when you went into the bank

7    that day?

8    A.  I went in.  I saw the teller that he described.  I waited

9    until there was an opportunity where I knew that I would get

10   her as my teller.  And I gave her the checks with the ID and

11   the bank card and I signed -- Well, after I signed the checks I

12   gave them to her and she cashed them and gave me the money.

13            MR. COYLE:  Mr. Santello, please put on the screen

14   what's already been put into evidence Government Exhibit 301.

15            (Pause)

16            MR. COYLE:  May we publish to the jury please?

17            THE COURT:  Yes.

18            MR. COYLE:  Please turn to pages 11 through 15.

19            (Pause)

20            MR. COYLE:  Go to 12, 13, 14, 15.

21            (Pause)

22   Q.  Ms. Robbins, do you recognize who's in these photographs?

23   A.  I do.

24   Q.  Who is that?

25   A.  It's me.

1    Q.  What are you doing in those photos?

2    A.  I am endorsing and cashing the checks.

3    Q.  What date were these photographs taken?

4    A.  These 29, 2017.

5          MR. COYLE:  Mr. Santello, please turn to pages seven

6    through 10.

7          (Pause)

8          MR. COYLE:  Go to eight.  Go to nine and 10.

9          (Pause)

10   Q.  Ms. Robbins, do you recognize these images?

11   A.  I do.

12   Q.  What are these images of?

13   A.  The checks that I endorsed and cashed.

14   Q.  If you look at the top left image of the check, it says

15   it's made out from Forsyth Street Advisers LLC.  Do you know

16   what Forsyth Street Advisers is?

17   A.  I do not.

18   Q.  And the checks are payable --

19         THE COURT:  Some might say "Forsyth" based on the last

20   witness's pronunciation.

21         MR. COYLE:  Excuse me, your Honor.  You are absolutely

22   correct.  Forsyth Street Advisers.

23   A.  I do not.

24   Q.  And the checks are payable to Sandra Mendieta.  Do you know

25   who that is?

1   A.  I do not.

2   Q.  But are these the checks that you cashed?

3   A.  Yes, they are.

4   Q.  And did you receive money from the bank after you cashed

5   these fake checks?

6   A.  I did.

7   Q.  Who did you give that money to?

8   A.  Laurell.

9   Q.  When did you give him the money?

10  A.  Once I left the bank.

11  Q.  Like immediately after?

12  A.  I got in the car and gave him the money.

13  Q.  Did he give you any money?

14  A.  He gave me the five hundred dollars that he said he would.

15          MR. COYLE:  You can take down the exhibit.

16          Thank you, Mr. Santello.

17          (Pause)

18  Q.  Ms. Robbins, you mentioned you and the defendant were

19  getting to know each other and perhaps a romantic relationship

20  leading up to this.  What happened in your relationship with

21  the defendant after you cashed those fake checks on December

22  29?

23  A.  It diminished.

24  Q.  Why is that?

25  A.  Laurell had wanted me to endorse and cash more fake checks.

1   Q.  Did he want you to do anything else?

2   A.  Yeah.

3   Q.  What's that?

4   A.  Travel with him endorsing fake checks and cashing them.

5   Q.  What do you mean "traveling", like outside of New York?

6   A.  Yes.

7   Q.  Did you agree with him to do that?

8   A.  No.

9   Q.  Why not?

10  A.  Because I knew it was a crime and I had already committed

11  one crime.

12          MR. COYLE:  Mr. Santello, can you please pull up for

13  the witness what's been marked for identification as Government

14  Exhibit 704A.

15          (Pause)

16  Q.  Ms. Robbins, do you recognize what's on the screen?

17  A.  I do.

18  Q.  What is it?

19  A.  It's a conversation, but photos of Laurell's car and of

20  him.

21  Q.  When you say it's a conversation, there appears to be a

22  phone in the image.  Whose phone is that?

23  A.  It's mine.

24  Q.  Is this a conversation that you had on your phone?

25  A.  Yes, it is.

1    Q.  Who is the other party in this conversation?

2    A.  My cousin.

3              MR. COYLE:  The government offers Government Exhibit

4    704A into evidence.

5              MR. MCGORTY:  Subject to connection, we have no

6    objection.

7              THE COURT:  Received subject to connection.

8              MR. COYLE:  May we publish to the jury?

9              THE COURT:  Yes.

10             (Pause)

11             MR. MCGORTY:  Your Honor, withdraw that.  We have no

12   objection.

13             THE COURT:  Okay.  Received.

14             (Government's Exhibit 704A received in evidence)

15             MR. COYLE:  Mr. Santello, if you could slowly scroll

16   from pages one, two and three.

17             (Pause)

18   Q.  Do you recognize the vehicle in these photographs?

19   A.  I do.

20   Q.  Whose vehicle is that?

21   A.  Laurell's.

22   Q.  Who took those photographs?

23   A.  I did.

24   Q.  What did you use to take them?

25   A.  My iPhone.

1              MR. COYLE:  Mr. Santello, please put up side-by-side.

2              THE COURT:  Actually, counsel, let me interrupt you.

3    I think I promised the jury we would give them a short

4    midafternoon break.  So this would be a good time.  I want to

5    keep this break to about ten minutes at most because we started

6    a little bit late after lunch, but why don't we take a

7    ten-minute break.

8              (Jury not present)

9              THE COURT:  You can step down.  We'll see you in ten

10   minutes.

11             (Witness not present).

12             THE COURT:  See you all in ten minutes.

13             (Recess)

14             THE COURT:  Please be seated.

15             MR. MCGORTY:  Your Honor, before we bring the witness

16   back, our client has advised us in light of the testimony he

17   has heard, he wishes to change his plea to a plea of guilty to

18   the crime as charged as distinguished from -- so, I defer to

19   the Court on that.

20             THE COURT:  Well, let me make sure I'm not wasting my

21   time.

22             Mr. Wells, are you prepared to plead to, for example,

23   the substance of what this witness just testified to?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  Okay.  Tell the jury that we are going to

1        have a 15-minute delay.

2                We'll place the defendant under oath.  Please raise

3        your right hand.

4                Do you swear to tell the truth, the whole truth and

5        nothing but the truth, so help you God?

6                THE DEFENDANT:  Yes, sir.

7                (Defendant Laurell Wells sworn)

8                THE COURT:  All right.  So let me advise you that

9        anything you say now that you are under oath is knowingly

10       false, that could subject you to punishment for perjury or the

11       obstruction of justice or making a false statement.

12               Do you understand that?

13               THE DEFENDANT:  Yes.

14               THE COURT:  So, we went over this yesterday but just

15       to go over it again, do you read, write, speak and understand

16       English?

17               THE DEFENDANT:  Yes.

18               THE COURT:  How far did you go in school?

19               THE DEFENDANT:  Eleventh grade.

20               THE COURT:  How old are you now?

21               THE DEFENDANT:  Thirty-eight.

22               THE COURT:  Have you ever been treated by a

23       psychiatrist or psychologist?

24               THE DEFENDANT:  No, sir.

25               THE COURT:  Have you ever been hospitalized for any

1    mental illness?

2              THE DEFENDANT:  No, sir.

3              THE COURT:  Have you ever been treated or hospitalized

4    for alcoholism?

5              THE DEFENDANT:  No, sir.

6              THE COURT:  Have you ever been treated or hospitalized

7    for drug addiction?

8              THE DEFENDANT:  No, sir.

9              THE COURT:  Are you currently under the care of a

10   doctor for any reason?

11             THE DEFENDANT:  No, sir.

12             THE COURT:  In the last 24 hours have you taken any

13   pills or medicine of any kind?

14             THE DEFENDANT:  No, sir.

15             THE COURT:  Is your mind clear today?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  Do you understand these proceedings?

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  Now, you have a right to be represented by

20   counsel at every stage of these proceedings; do you understand?

21             THE DEFENDANT:  Yes, sir.

22             THE COURT:  You're represented by Crowell & Moring

23   attorneys.  Are you prepared to go forward with this plea with

24   them representing you?

25             THE DEFENDANT:  Yes, sir.

```
 1              THE COURT:  Now, before I can accept any plea of
 2   guilty, I need to make sure that you understand the rights that
 3   you will be giving up if you plead guilty.  So I want to go
 4   over it again those rights.
 5              First, you have the right to a speedy and public trial
 6   by a jury on the charges against you such as the trial that's
 7   going on right now.
 8              Do you understand that?
 9              THE DEFENDANT:  Yes.
10              THE COURT:  Second, if there were a trial, you would
11   be presumed innocent and the government would be required to
12   prove your guilt beyond a reasonable doubt before you could be
13   convicted of any crime.
14              Do you understand that?
15              THE DEFENDANT:  Yes, sir.
16              THE COURT:  Third, at the trial you have a right to be
17   represented by counsel and if you cannot afford counsel then as
18   has already been the case, counsel will be representing you
19   free of charge.
20              Do you understand that?
21              THE DEFENDANT:  Yes.
22              THE COURT:  Fourth, at the trial you have the right to
23   see and hear all witnesses and other evidence against you and
24   your attorney can cross-examine the government's witnesses and
25   object to the government's evidence and can offer evidence on
```

1    your own behalf and have subpoenas issued to compel the

2    attendance of witnesses and other evidence on your behalf.

3              Do you understand that?

4              THE DEFENDANT:  Yes, sir.

5              THE COURT:  Fifth, at the trial you would have the

6    right to testify if you wanted to but no one could force you to

7    testify if you did not want to and no suggestion of guilt could

8    be drawn against you if you chose not to testify.

9              Do you understand that?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  And sixth, even if you were convicted, you

12   would have the right to appeal your conviction.

13             Do you understand that?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  Now, do you understand that if you plead

16   guilty you will be giving up all these rights?

17             THE DEFENDANT:  Yes, sir.

18             THE COURT:  Very good.  Now, we went over the

19   indictment yesterday, but let me ask counsel, do you want the

20   indictment read again or do you waive the reading?

21             MR. MCGORTY:  We waive the reading.

22             THE COURT:  So, do I understand from the government

23   that the same Pimentel calculation that you presented yesterday

24   still applies?

25             MR. COYLE:  Yes, your Honor.

1          THE COURT:  Okay.  And I seem to have --

2          MR. COYLE:  Your Honor, actually, I will say we were

3   chatting amongst ourselves as to whether the two point

4   acceptance of responsibility reduction applies if you've

5   already at trial.  I don't have it fully rung down but we think

6   it does.

7          THE COURT:  This as you know -- repeatedly the

8   guideline calculation means nothing to me.  So it wouldn't

9   matter one way or the other.  I know the situation.  But, do

10  you have a copy?

11         MR. COYLE:  Ms. Rothman is running to go get it right

12  now.

13         THE COURT:  So, remind me, what's the maximum that the

14  defendant faces on each of the counts?

15         MR. COYLE:  The bank fraud and wire fraud conspiracy

16  count is a maximum of 30 years.

17         THE COURT:  Count One?

18         MR. COYLE:  The substantive bank fraud.  Count Two is

19  a maximum of 30 years and aggravated identity theft is

20  mandatory minimum of two years to run consecutively.

21              (Continued on next page)

22

23

24

25

1          THE COURT:  You're facing a potential maximum of what,

2     62 years?

3          THE DEFENDANT:  Um-hum.

4          THE COURT:  You understand that?

5          THE DEFENDANT:  Yes.

6          THE COURT:  As I told you yesterday, it's still the

7     case, I have no idea what sentence I will impose if you plead

8     guilty.  So if anyone has made any kind of promise or

9     prediction or estimate to you, that person could be wrong.  But

10    if you plead guilty, you will still be bound by my sentence.

11         Do you understand that?

12         THE DEFENDANT:  Yes.

13         THE COURT:  Tell me now in your own words what it is

14    that you did that makes you guilty of these counts.

15         THE DEFENDANT:  I conspired with others to commit

16    fraud.

17         THE COURT:  Does that include the witness you just

18    heard from?

19         THE DEFENDANT:  Yes.

20         THE COURT:  And did you agree with her, among others,

21    to have a scheme to defraud banks by submitting phony checks?

22         THE DEFENDANT:  Yes.

23         THE COURT:  And did you receive at least part of the

24    proceeds of that fraud?

25         THE DEFENDANT:  Yes.

1          THE COURT:  And in connection with that conspiracy and

2     in connection with the substantive acts of defrauding the bank,

3     the banks, did you use identities of other persons that you

4     knew had not given permission to use their identities?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Is there anything else regarding the

7     factual portion of the allocution that the government wish the

8     Court to inquire about?

9          One last thing.  When you did all these things, you

10    knew what you were doing was illegal and wrong?

11         MR. COYLE:  Did he know that the identities were real

12    people?

13         THE COURT:  I will ask him that, although I continue

14    to believe that's not necessarily a requirement.  But, for

15    example, you knew that Forsyth was a real company, yes?

16         THE DEFENDANT:  I didn't know that was a real company.

17         THE COURT:  Did you know that the reason the checks

18    were going to be cashed was because the bank was going to

19    believe these were real customers?

20         THE DEFENDANT:  Yes.

21         THE COURT:  I think that's good enough.  Your

22    colleague says not good enough.  Fine.  You put a question or

23    let her put a question.

24         MR. COYLE:  As part of the scheme, were real people's

25    or real companies' identifying information used to make those

1      fake documents?  That's what enabled them to be cashed.

2            THE COURT:  I will ask him that, but just looking at

3      the indictment, he has already stated all the elements of

4      Counts One and Two, so we are now concerned only with Count

5      Three, which is going to be, of all the counts here, the least

6      relevant because he has already served more than two years.  So

7      we are talking the kind of issue that only a lawyer could love,

8      but, anyway.

9            The statute says that he has to use, without lawful

10     authority, a means of identification of another person during

11     and in relation to the bank fraud scheme.  I am not sure that

12     requires that he know whether it's a real person or not.  It

13     just requires that in fact it be another person or not, which

14     you can do a proffer on, and we have already heard some

15     testimony, even this afternoon, that would support that.  I

16     don't think we need to ask Mr. Wells anything further.

17           I now have another copy of the *Pimentel* letter.  We

18     went over this, Mr. Wells, later, but the government believes

19     that your guideline range, which is of no particular interest

20     to the Court, but occupies an inordinate amount of time of the

21     AUSAs in this district, that the guideline range is 188 to 235

22     months on Counts One and Two, plus the 24 months' imprisonment

23     mandatory on Count Three.

24           Do you understand that's their position?

25           THE DEFENDANT:  Um-hum, yes.

1          THE COURT:  Anything else we need to cover before I

2     ask the defendant to formally plead guilty?

3          Anything further from the government?

4          MR. COYLE:  Not before that, your Honor.  I want to

5     ask you one question at the end.

6          THE COURT:  Go ahead.

7          MR. COYLE:  You can proceed with the formal plea.

8          THE COURT:  Anything else defense counsel wants me

9     to --

10          MR. McGORTY:  Just a proffer of venue from the

11     government, just so the record is complete.  I think it carries

12     over from yesterday.

13          THE COURT:  What do you want to proffer as to the

14     facts that these are real people?

15          MR. McGORTY:  Venue is --

16          THE COURT:  Venue.  Definitely have to proffer as to

17     that.

18          MR. COYLE:  Yes, of course.

19          THE COURT:  While I'm very interested in protecting

20     the people of Cos Cob, Brooklyn, not to mention Iowa, the

21     Southern District of New York is where we are concerned.

22          MR. COYLE:  Your Honor, don't worry because right next

23     to Cos Cob is the Village of Rye Brook, which falls on the

24     Westchester County side of the line.

25          The government will proffer that its evidence would

1  show that the defendant himself cashed a fake check using a

2  fake identity at that M&T branch.  The government's evidence

3  would show that the defendant conspired with his girlfriend

4  that was an employee of the DMV to give him customer account

5  information from DMV files in order to make the checks that are

6  used to commit the fraud.

7          THE COURT:  You're talking about the DMV in Manhattan.

8          MR. COYLE:  It is up in White Plains, your Honor.

9          THE COURT:  That's part of the Southern District of

10  New York.

11          MR. COYLE:  You heard from Ms. Sandrof that her

12  company that was a victim of the defendant's fraud is based

13  right here in Manhattan.  That's where they have their office.

14          THE COURT:  Yes, Mr. Wells.

15          THE DEFENDANT:  Before you answer that, I was curious

16  about that because the 2019 Rye Brook, I was sentenced on that

17  already.

18          THE COURT:  That may or may not be relevant, but this

19  was just to establish that something occurred in the Southern

20  District of New York, and the offense concerning Forsyth, for

21  example, occurred, the company was based in Manhattan.  It

22  doesn't have to involve you being in the Southern District of

23  New York, although clearly you were at various times.  It just

24  has to involve some part of the conspiracy being in the

25  Southern District of New York and ditto White Plains, where the

1   DMV was located.

2          Based, Mr. Wells, on everything we have discussed, how

3   do you now plead, first, to Count One, the conspiracy charge,

4   guilty or not guilty?

5          THE DEFENDANT:  Guilty.

6          THE COURT:  How do you plead to Count Two, the

7   substantive bank fraud charge, guilty or not guilty?

8          THE DEFENDANT:  Guilty.

9          THE COURT:  How do you plead to Count Three, the

10  aggravated identity theft charge, guilty or not guilty?

11         THE DEFENDANT:  Guilty.

12         THE COURT:  Because the defendant has acknowledged his

13  guilt as charged, because he has shown that he understands his

14  rights and because his plea is entered knowingly and

15  voluntarily and is supported by an independent basis in fact

16  containing each of the essential elements of the three

17  offenses, I accept his plea and adjudge him guilty of counts

18  One, Two, and Three of indictment S1 20 CR 633.

19         Mr. Wells, we are going to set a sentencing date, but

20  before the sentence the probation department will prepare

21  what's called a presentence report.  As part of that you will

22  be interviewed by the probation officer.  Your counsel could be

23  present to advise you of your rights, but under my practices

24  you personally need to answer the questions put to you by the

25  probation officer.  And given your preferences, I'm sure that's

1    fine with you.  But I just wanted to make sure you knew that.

2    The probation officer will want to hear what you have to say.

3              After that report is in draft form, but before it's in

4    final form, you and your counsel and also government counsel

5    will have a chance to review it and to offer suggestions,

6    corrections, and additions to the probation officer who will

7    then prepare the report in final to come to me.

8              Independent of that, counsel for both sides are hereby

9    given leave to submit directly to the Court in writing any and

10   all materials relating to any aspect of sentencing, provided

11   that those materials are submitted no more than one week before

12   sentencing.

13             We will set the sentencing down for?

14             THE DEPUTY CLERK:  Tuesday, December 19, at 3:00.

15             THE COURT:  Tuesday, December 19, at 3 p.m.

16             Yes, sir.

17             MR. McGORTY:  The day works for the defense, your

18   Honor.  Thank you.

19             THE COURT:  I think we will excuse Mr. Wells at this

20   point.  I think we will then bring in the jury, and I'll

21   explain to them that the matter has been resolved.  But I don't

22   want to put Mr. Wells in the awkward position of having the

23   jury stare at him while I explain to him that he has now pled

24   guilty.

25             Mr. Wells, I think you did the right thing, is my own

1  opinion, and we will move forward now to the sentencing.  And I

2  want to repeat to you, at sentencing I want to know everything

3  about you; not just the bad but the good.  Not just the

4  present, but the past.  I look forward to hearing from you in

5  that regard.

6          Anything else that counsel needs to raise?

7          MR. COYLE:  Yes, your Honor.  The government would

8  like to raise one thing.  As you know, you probably gleaned

9  from the government's opening statement, the government's proof

10  of the defendant's fraud was much broader than --

11          THE COURT:  I assume you will bring that out in your

12  submissions to me.  If we wind up having to have a *Fatico*

13  hearing, which I suspect we won't, but if we do, we do.  We

14  will see what your adversary says about that.

15          MR. COYLE:  Your Honor, I just wanted to raise that

16  because the government has flown up a number of witnesses from

17  Florida to prove a much bigger conspiracy.  These are people

18  that work low-paying jobs.  They took time off to get here.

19          And everything the government knows, we highly suspect

20  that the defendant will challenge the government's evidence and

21  that a *Fatico* will be necessary.  It is a unique request.

22          In light of these very unique circumstances, the

23  government would request a one-day evidentiary hearing tomorrow

24  simply to hear from those witnesses, to not have to bring them

25  back up in order to prove up the extent of the government's

1   fraud when we move on the sentencing.  It could just be two

2   witnesses, your Honor, tomorrow, for the purpose --

3          THE COURT:  No.  I want to see what you will submit,

4   and I want to see what he challenges, if anything.  I think

5   Mr. Wells now knows that he has got to be more forthcoming, and

6   I will look forward to his being that way, and then we will see

7   what's in dispute.

8          You can certainly tell your witnesses how much the

9   Court appreciates them being here and I'm very, very happy that

10  they took the time.  Frankly, they should be somewhat happy

11  that it may be that they won't have to testify at all.  We'll

12  see.

13         MR. COYLE:  I will share that message.

14         THE COURT:  Very good.

15         Marshals, you can take Mr. Wells back.

16         Let's bring in the jury as soon as he is gone.

17         You can bring in the jury.

18         (Jury present)

19         THE COURT:  Ladies and gentlemen, the reason we had

20  that lengthy delay is that the defendant, having heard the last

21  witness, decided to plead guilty to all charges against him,

22  and I just took his guilty plea, which is why we had to keep

23  you back in the room until that happened.

24         That's obviously a positive result.  It's always good

25  when people admit to their crimes.  And the sentencing will now

 1    be up to me and it won't be for some time.  We always do

 2    investigations into everyone's past and all like that before we

 3    impose sentence.

 4            What I wanted to do is not only inform you that your

 5    service is now completed, but you still get the full credit,

 6    which means that you won't have to serve on a federal jury for

 7    four years.  I know you're heartbroken to hear that.  But

 8    nevertheless, that's -- I also -- I always observe juries out

 9    of the corner of my eye, and I was looking at all of you this

10    afternoon, and you were all very tentative.  It was clear you

11    were going to be a really terrific jury.  So I am very, very

12    grateful for your help, but you are now excused.

13            (Jury excused)

14            THE COURT:  I'm only sorry that I didn't get to see

15    the cross-examination of that witness, which would have been a

16    challenge indeed.  I thank you, all counsel.  This has

17    certainly been a different experience from most.

18            But I am grateful, first, to the government for their

19    continued patience, and I'm grateful to defense counsel for

20    their continued help to the defendant under very difficult

21    circumstances and to the cause of justice and that was all

22    greatly appreciated.  And at least one cross-examination did

23    take place, so that was helpful to future experience.

24            Very good.  I have another matter at 4:00.  If you can

25    clear out.    (Trial concluded)

INDEX OF EXAMINATION

Examination of:                                    Page

ESTHER SANDROF

Direct By Ms. Cheng  . . . . . . . . . . . . . .59
Cross By Ms. Giffuni . . . . . . . . . . . . . .72
 SUMMER ROBBINS

Direct By Mr. Coyle  . . . . . . . . . . . . . .74

                    GOVERNMENT EXHIBITS

Exhibit No.                                    Received

1005, 301-306, 308, including their . . . . . .64
          subparts, 401-430, including
          their subparts, 609,
          609A-609H, 608, 608A-608D,
          601-607

Three   . . . . . . . . . . . . . . . . . . . .77

201 and 202   . . . . . . . . . . . . . . . . .78

203   . . . . . . . . . . . . . . . . . . . . .84

704A   . . . . . . . . . . . . . . . . . . . . .90