

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 12, 2023

**BY ECF**
Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re:   *United States v. Laurell Wells*, 20 Cr. 633 (JSR)

Dear Judge Rakoff:

    The Government submits this letter in advance of sentencing in this matter for defendant Laurell Wells (the "defendant"), which is scheduled for December 19, 2023. Because of the seriousness of the offense and the defendant's status as a serial recidivist fraudster, the Government respectfully submits that a sentence of 180 months' imprisonment is sufficient but not greater than necessary to achieve the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).

**A. Background**

    i.   <u>The Offense Conduct</u>

        *a.  Overview of the Fraud*

    Between 2017 and 2020, the defendant orchestrated a massive bank fraud and identity theft scheme in which he targeted at least three different financial institutions in scores of fraudulent transactions at bank branches located across the United States. He used dozens of stolen identities to do so. (*See* Final Presentence Investigation Report dated December 12, 2023 ("PSR") ¶¶ 11-13).

    To effect his scheme, the defendant conspired with co-defendant Georgia Ward,[1] an employee at the New York State Department of Motor Vehicles ("DMV"), as well as employees at financial institutions to provide him with personal identifying information ("PII") and other bank account information. The defendant then arranged to have fraudulent identifying documents, checks and money orders created using this PII and bank information. The defendant also recruited

---

[1] Ward was charged with the defendant for her participation in this fraud scheme and pled guilty on March 29, 2022. The Court sentenced Ward to time served with nine months of home confinement and three years of supervised release on September 29, 2022.

co-conspirators to impersonate bank customers, cash fraudulent checks and money orders, and withdraw funds from the victim financial institutions. (PSR ¶¶ 11-12).

As a means to recruit and ingratiate himself with the bank employees and other co-conspirators that he enlisted in the scheme, the defendant often started a romantic relationship with his co-conspirators and then manipulated them into participating in the scheme.  At times when these co-conspirators expressed their discomfort and intention to stop helping the defendant defraud the banks, the defendant threatened to report their activities to their employers, thereby ensuring their continued participation in his fraud.  Ultimately, seven co-conspirators, including two bank employees, were arrested by law enforcement and/or fired by their employers for participating in the defendant's scheme. (PSR ¶ 13).

### b. The JPMorgan Chase Fraud

In November 2017, the defendant, using the alias "Corey," contacted through an online dating website a woman named Faith Brewster, who worked as an assistant branch manager at a JPMorgan Chase bank branch in Brooklyn, New York.  Publicly available information on Brewster's dating profile showed that she was an employee of the bank.  After meeting in-person and beginning a romantic relationship with Brewster, the defendant asked Brewster to provide him with confidential customer account information that would allow him to make fake checks that could be cashed at the bank.  Brewster agreed to do so.  Over the next several weeks, Brewster provided the defendant with the customer information he requested, and also approved transactions for fake checks to be cashed at the bank branch where she worked.  Call and text records from the defendant's cellphone show that he was in frequent communication with Brewster between November 23, 2017 and January 8, 2018, during the time frame of the fraudulent scheme. (PSR ¶¶ 14-20).

Around the same time, the defendant started a romantic relationship with another woman named Summer Robbins.  Wells introduced himself to Robbins using the same alias, "Corey."  After briefly dating, the defendant convinced Robbins to go into the JPMorgan Chase bank branch where Brewster worked to cash several fraudulent checks.  Brewster was the teller who approved those fraudulent transactions.  Robbins gave the money from the cashed checks to the defendant. (PSR ¶ 16).

In early 2018—before law enforcement initiated this investigation—internal investigators from JPMorgan Chase began looking into Brewster's connection to several fraudulent transactions at the bank.  The investigators interviewed Brewster on January 25, 2018.  During the interview, Brewster confessed to her involvement in the scheme and signed a written statement in which she admitted to providing customer information to and processing fraudulent checks for a person named "Corey."  Brewster also provided a phone number she had used to communicate with "Corey" to the investigator.  That same day, Brewster emailed a photograph of the defendant – i.e., "Corey" – to the bank investigator.  Shortly thereafter, JPMorgan Chase terminated Brewster. (PSR ¶¶ 14-16).

The Government's evidence at trial would have demonstrated that the defendant defrauded JPMorgan Chase out of approximately $35,000 through his scheme working with Brewster.

However, JPMorgan Chase's internal fraud department connected the defendant to more than $3.2 million in losses in connection with similar schemes dating back to approximately 2011.

### c.  The Regions Bank Fraud

In late 2018, the defendant, using the alias "Bryant," contacted another woman ("CC-1") through Facebook.  CC-1 worked as a teller at a Regions Bank branch in Louisiana.  Under the guise of a romantic relationship, the defendant asked CC-1 for account numbers and PII of Regions Bank customers.  CC-1 obliged, sending the defendant confidential information for more than 50 Regions Bank customers between 2018 and 2019.  (PSR ¶ 21).

CC-1 met the defendant in-person during a visit to Louisiana.  At the time, the defendant was with another female.  Shortly thereafter, CC-1 was working at her bank when that same female came into her branch and presented a fake check that included customer information that CC-1 had provided to the defendant. (PSR ¶ 22).

In late 2019, the defendant, now using the alias "Darrell," worked with another woman ("CC-2") to perpetrate additional frauds on several Regions Bank branches in the Midwest and Southeast.  Working with the defendant, CC-2 impersonated Regions Bank customers and cashed fake checks or money orders, then withdrew funds from the accounts held in the names of the customers she was impersonating.  Upon withdrawing funds from the various Regions Bank branches, CC-2 gave the money to the defendant.  (PSR ¶ 23).

CC-2 was arrested in a Regions Bank branch in Florida while trying to cash fake checks and withdraw funds as part of the defendant's scheme.  Following her arrest, CC-2 identified a photo of the defendant as the person she knew as "Darrell" who orchestrated the bank fraud scheme.  CC-2 was charged federally in the Northern District of Florida, pled guilty, and later entered into a cooperation agreement with federal prosecutors. (PSR ¶ 24).

The Government's evidence at trial would have demonstrated that the defendant defrauded Regions Bank out of approximately $125,000 in 30 different transactions, utilizing more than 20 stolen identities, through his scheme working with CC-2.  The attempted loss amount was more than $143,000.  (PSR ¶ 25).

### d.  The M&T Bank Fraud

In March 2019, the defendant entered an M&T Bank branch in Rye Brook, New York, and presented fake identification documents bearing the name of a bank customer ("CC-3").  The defendant then cashed a fake check for $3,900 and withdrew the money using the identity of CC-3.  Bank employees learned the defendant had attempted to cash other checks using the identity of CC-3 at M&T Bank branches in Cos Cob, Connecticut, and Harrison, New York.  Messages retrieved from the defendant's cellphones show that he was working in tandem with CC-3 to use CC-3's identifying information to perpetrate the fraud on M&T Bank.  The defendant was arrested by the Rye Brook Police Department on May 1, 2019.  At the time of his arrest, officers recovered a fake passport card in the name of CC-3 but containing a picture of the defendant.  The defendant also had in his possession three credit cards in the name of an unknown female. (PSR ¶¶ 34-35).

*e. Evidence Seized Pursuant to Search Warrants*

Three phones were seized from the defendant, along with the contents of his dating profile, and they contained overwhelming evidence of the defendant's bank fraud and identity theft scheme. For example, the phones contained messages between the defendant and Ward, in which Ward provided the defendant with PII, including photographs, dates of birth, and pictures of signatures of various people that she obtained through her employment with the DMV. (PSR ¶¶ 18-19).

The defendant's phones also contained communications with CC-1—the bank teller from the Regions Bank branch in Louisiana that he recruited into the scheme—which showed CC-1 sharing confidential customer information with the defendant. The phones also contained text messages with CC-3—the bank customer whose identity the defendant used to cash fraudulent checks at M&T Bank—showing that the defendant and CC-3 worked together to perpetrate the fraud on M&T Bank. (PSR ¶¶ 26-32, 34. 36-38).

Likewise, the defendant's dating profile included, among other things, messages with Brewster consistent with her account of how she met the defendant, as well as overtures to several other females seemingly for purposes of involving them in his schemes.

ii.   The Defendant's Criminal History

The defendant has 22 criminal history points, placing him in the highest criminal history category allowable under the Sentencing Guidelines. The defendant's criminal history is principally driven by state court convictions for perpetrating the same type of fraud that was charged in this case, on at least seven different occasions over the course of nearly a decade. (*See* PSR ¶¶ 83-105).

iii.   Procedural History

On November 13, 2020, the defendant was charged by Complaint with conspiracy to commit wire and bank fraud, in violation of 18 U.S.C. § 1349, and aggravated identity theft, in violation of 18 U.S.C. § 1028A. The defendant was arrested on November 18, 2020. On November 24, 2020, a grand jury sitting in the Southern District of New York returned Indictment 20 Cr. 633, charging the defendant with conspiracy to commit wire and bank fraud, in violation of 18 U.S.C. § 1349, and aggravated identity theft, in violation of 18 U.S.C. § 1028A. On June 12, 2023, a grand jury returned Superseding Indictment S1 20 Cr. 633, charging the defendant with an additional count of bank fraud, in violation of 18 U.S.C. § 1344.

Trial against the defendant commenced on September 19, 2023. In a break during the testimony of the second witness, the defendant pleaded guilty to all counts of the Superseding Indictment.

On December 12, 2023, the United States Probation Office ("Probation Office") issued its final PSR for Wells. That report calculated a Sentencing Guidelines range of 130 to 162 months'

imprisonment, plus a mandatory and consecutive term of 24 months' imprisonment [2] (the "Guidelines Range"), based on an offense level of 27 and a criminal history category of VI. (PSR ¶ 162). The Probation Office recommends a sentence of 154 months' imprisonment.

### B. Discussion

####    i.  Applicable Law

Following *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant;

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

---

[2] "in determining any term of imprisonment to be imposed for the felony during which the means of identification was transferred, possessed, or used, a court shall not in any way reduce the term to be imposed for such crime so as to compensate for, or otherwise take into account, any separate term of imprisonment imposed or to be imposed for a violation of this section . . . " 18 U.S.C. § 1028A(b)(3).

ii.   A Sentence of 180 Months' Imprisonment Is Appropriate

The Court should impose a sentence of 180 months' imprisonment.  Such a sentence is necessary given the seriousness of the offense, the characteristics of the defendant, the need to protect the public from future crimes of the defendant, and the need to promote respect for the law and afford adequate deterrence to criminal conduct.

The defendant is a recidivist fraudster and serial manipulator to an extraordinary degree. As described below, his actions have caused enormous harm to several groups of people for many years.

*a.   The Women the Defendant Recruited into his Scheme*

Perhaps the people who suffered most from the defendant's conduct are those he recruited to participate in his scheme.  The defendant targeted vulnerable people, typically women, who often had no desire or inclination to engage in his crimes.  But by using extreme manipulation and deceit, he persisted until they agreed to help him.  The defendant then used threats and intimidation to force these women to continue helping him commit crimes.  As described below, many of these women were left jobless and/or facing criminal charges as a result of the defendant's manipulation, while the defendant moved on in search of his next victims.

*First*, the Court heard the testimony of Faith Brewster at the *Franks* hearing held on September 5, 2023.  Ms. Brewster was in her early twenties and a single mother to a young son when she met the defendant.  She was the daughter of a minister, a deeply religious person, and had never before committed a crime.  She started working as a teller at a J.P. Morgan Chase branch in Brooklyn and, before long, was promoted to assistant branch manager.  The defendant targeted her on an online dating website.  It was evident from Ms. Brewster's online profile that she worked at a bank.  The defendant initiated a romantic relationship with her.  He then started probing whether she could help him steal money from the bank where she worked.  She declined.  But the defendant persisted over and over again.  He convinced her that she could make extra money for her and her young son, which she badly needed at the time.  Eventually Ms. Brewster agreed to help the defendant by providing him with the customer information he requested, and also approved transactions for fake checks to be cashed at the bank branch where she worked.  But within a short period of time, she changed her mind and wanted to stop.  She told this to the defendant, and he responded by threatening that he would report her to her branch managers if she did not continue in the fraud.  He even showed up at her bank branch with an Edible Arrangement fruit platter while she was working, which she perceived as him sending a message to her that he could show up and report her at any time if she didn't continue helping him.  Ms. Brewster was eventually interviewed by bank investigators.  She fully admitted her involvement in, and provided information about, the defendant's scheme.  She was ultimately fired from the bank and arrested by the NYPD for helping defendant.

*Second*, the Court heard the testimony of Summer Robbins at trial on September 19, 2023. The defendant pleaded guilty to all counts during a break from Ms. Robbins' direct examination. Ms. Robbins and the defendant started casually dating around the same time the defendant was

enlisting Ms. Brewster into the fraud under the guise of being romantically interested in her, which was unknown to either woman.  Like Ms. Brewster, Ms. Robbins had never before committed a crime.  After dating for a few weeks, the defendant said he needed money and asked Ms. Robbins to help him cash fake checks using a stolen identity that he would provide to her.  She declined. The defendant persisted again and again.  Ms. Robbins finally agreed to help him a single time by cashing fake checks at the bank branch where Ms. Brewster worked.  After that, the defendant asked her to help him commit more frauds, but she told him she'd never do it again.  The defendant told Ms. Robbins that he wanted her to travel across the country with him to help recruit other women to go into banks and cash fake checks.  Ms. Robbins said no.  After J.P. Morgan Chase reported Ms. Brewster to the NYPD, detectives connected Ms. Robbins to the fraudulent checks she cashed and she was subsequently arrested.  She spent a night in jail.  After she was released from jail, the tires on her vehicle were slashed and she suspected the defendant was responsible. She thereafter engaged in a text message conversation with the defendant[3], in which he called her, *inter alia*,  a "Lyin snitch bitch!!!", as shown in the excerpt below.



Ms. Robbins told the defendant she was "fearing for [her] life" and believed he was "threatening [her] family", to which the defendant responded, "ain't nobody thinking about your snitch ass."



---

[3] A complete copy of the text message thread between Ms. Robbins and the defendant is attached hereto as Government Exhibit A.  The messages in blue were sent by Ms. Robbins, and the messages in gray were sent by the defendant.

Finally, the defendant taunted Ms. Robbins by indicating that even if she "snitched" on him by telling the NYPD about his involvement in the fraud, he would ultimately beat the charges or receive a minimal sentence, as depicted below.



The defendant pleaded guilty shortly before the Government intended to offer these text messages into evidence during the direct examination of Ms. Robbins.

*Third*, the Government intended to call as a witness at trial CC-1, the woman who worked as a teller at a Regions Bank branch in Louisiana and who the defendant recruited into the scheme. In late 2018, the defendant contacted CC-1 through Facebook and started a romantic relationship with her. Similar to Ms. Brewster, CC-1's online profile showed that she worked at a bank. The defendant told CC-1 he wanted to move down to Louisiana to start a life with her; that he wanted them to move in together. But he said he desperately needed money first, in part because his sister had just died and he now had to take care of his deceased sister's son, "Larry."[4] The defendant

---

[4] CC-1 now believes this was an invented story the defendant told her so that she felt sorry for him and to convince her to help the defendant commit fraud. Notably, the PSR states that the defendant

asked CC-1 for account numbers and PII of Regions Bank customers.  CC-1 obliged, sending the defendant confidential information for more than 50 Regions Bank customers between 2018 and 2019.  Despite never before committing a crime, CC-1 felt that it was her responsibility to help support the man she was falling in love with and wanted to start a life with.  She lost her job at Regions Bank shortly after helping the defendant.  Government Exhibit B is a complete text message thread between the defendant and CC-1, and it provides a vivid picture into the defendant's deceit and callousness toward CC-1 and other women he involved in his fraud.[5]  In the excerpt below, the defendant first enlisted CC-1 in his scheme by inventing the story that his sister died and he needed money to "bury her."



_____

has only one sister with whom he last spoke in June 2023, and there is no mention of the defendant caring for a child by the name of "Larry." (PSR  ¶ 118).

[5] The defendant's messages are in green, and CC-1's messages are in blue.

In the excerpt below, the defendant doubled-down on the story that he needed money soon or else his sister's "body will be rotten."



As depicted in the excerpt below, CC-1 agreed to help the defendant steal money for him and "lil Larry too."  The defendant made her falsely believe that "lil Larry" had just lost his mother and they were in desperate need of money.



When the defendant was first trying to convince CC-1 to help him steal money from the bank, he pretended he was in love with her.  In the message below, he called her his "future wife to be" and "sweetie pie."



The defendant then increased his demands of CC-1 that she send him more images of checks, while calling her "love muffin."



After CC-1 was fully engaged in the defendant's scheme, the defendant's tone changed and he became more aggressive in his demands.  In the message excerpt below, he asked if CC-1 would be sending him five more check images.  When she replied no, he said "but you will right?"



In another example, after CC-1 sent the defendant images of checks at his direction, he chastised her, stating "those are horrible pics . . . I can't see a single thing."



And in the final excerpt below, CC-1 expressed concern to the defendant about being fired from the bank, to which the defendant responded, "if they let you go please blame yourself for us not having money to the side . . . I fuckin told you . . . why the fuck am I always right."



The defendant eventually dropped the ruse of being interested in starting a life together with CC-1, and instead secured her continued cooperation in his scheme by threatening her. CC-1 reported in interviews with the Government and was prepared to testify at trial that the defendant exhibited threatening behavior toward her, intimidated her, and at one point told her that if she didn't continue to help him he would report her conduct to Regions Bank managers. Essentially, the defendant ran the same playbook with CC-1 that he did with Ms. Brewster.

*Fourth*, the Government intended to call as a witness at trial CC-2, the  woman who took three trips with the defendant to defraud Regions Bank branches in the Midwest and Southeast in late 2019. Working with the defendant, CC-2 impersonated Regions Bank customers and cashed fake checks or money orders, then withdrew funds from the accounts held in the names of the customers she was impersonating. Upon withdrawing funds from the various Regions Bank branches, CC-2 gave the money to the defendant. A few years prior to her involvement, CC-2's husband of many years died unexpectedly. She was shocked and aggrieved by his death, and thereafter turned to using drugs. She developed a severe addiction. At the time she participated in the fraud with the defendant, CC-2 was badly addicted to heroin and needed money to support her addiction. The defendant was aware of her addiction and her need for money. On their second

trip together, CC-2 was in the midst of withdrawal and indicated she had to stop participating in the fraud, stating "I'm getting on a plane I can't drive anymore."  But the defendant persisted, saying "I know you need your stuff! . . . We only have 2 more stores . . . just get the stuff so you can go ahead home."[6]



CC-2 was arrested in a Regions Bank branch in Florida while trying to cash fake checks and withdraw funds as part of the defendant's scheme.  CC-2 was charged federally in the Northern District of Florida, pled guilty, and later entered into a cooperation agreement with federal prosecutors.  She testified at trial against a co-conspirator in the defendant's scheme.  She served nearly two years in prison.

As described above, the defendant exhibited extreme deceit and callousness toward the women he recruited into his fraud.  These women's lives were gravely impacted as a result of the defendant's actions.  In addition to the four women described above, there are likely many others that experienced similar harm from the defendant.  For example, a different Regions Bank

---

[6] A copy of the complete text message thread between the defendant and CC-2 is included herewith as Government Exhibit C.  CC-2's messages are in green.  The defendant's messages are in blue.

employee testified at trial against a co-conspirator of the defendant in the Northern District of Florida after similarly becoming involved in the defendant's scheme. And another woman (in addition to Ms. Brewster and Ms. Robbins) was arrested by the NYPD for impersonating J.P. Morgan Chase customers at the direction of the defendant. The Government was unable to locate her due to her not having a stable residence or employment.

### b. The Defendant's Identity Theft Victims

The defendant also caused severe harm to the victims whose identities he stole. At trial, Esther Sandrof testified that she ran a small non-profit consultancy focused on providing affordable housing in New York City. She was informed by J.P. Morgan Chase that her accounts had been compromised and needed to be changed as a result of the defendant's fraud. This caused real harm to her business, which spent months changing accounts and its invoice processes with customers and vendors. Given the breadth of the defendant's fraud, there are likely scores if not hundreds of other victims similar to Ms. Sandrof whose identities were stolen by the defendant to drain money from their accounts. The defendant's partner and co-defendant, Georgia Ward, sent him a significant volume of individual customer profiles from the DMV, some of whose identities he used to defraud banks. The bank insiders he recruited into his scheme sent him scores of other customer profiles for the purpose of stealing their identities and money.

### c. The Banks

The defendant caused millions of dollars of loss to the financial institutions he victimized. J.P. Morgan Chase alone conducted an analysis linking the defendant to fraudulent conduct in over 400 complaints dating back to 2012. J.P. Morgan Chase assessed the bank's financial loss at approximately $3.2 million. Yet the Government's evidence shows that the defendant perpetrated his fraud not only on J.P. Morgan Chase, but on many other financial institutions, including Regions Bank, M&T Bank, Bank of America, and others.

As noted above, the defendant's criminal history shows that he is a professional criminal who has engaged in the same fraud continuously since at least 2011. He reported to Probation that he has not had a job since 2013. (PSR ¶ 131). He has a staggering 22 criminal history points, placing him in Criminal History Category VI, the highest allowable under the Sentencing Guidelines. (*See* PSR ¶¶ 79-102.) The total financial loss, as well as the harm to the people whose identities he stole and others the defendant involved in his scheme, is immense. Therefore, a substantial sentence is necessary to properly account for the characteristics of the defendant and the seriousness of his conduct.

### d. The Defendant's Post-Arrest Conduct

Despite causing extraordinary harm in his decades-long pattern of fraudulent conduct, the defendant has proven himself to be utterly unremorseful and incapable of taking responsibility for his actions throughout the nearly three years between his arrest and trial. He submitted numerous *pro se* filings accusing the Government of, *inter alia*, doing "everything possible to cover up and distract the court and the proceedings from what actually occurred." *See* Dkt. No. 132 at 2. The defendant was appointed four separate sets of counsel, filed numerous pre-trial motions, and demanded hearings to pursue baseless legal and factual theories. This conduct continued up until

the morning of trial, when the defendant persisted in his deceit and misdirection, stating: "I want to get the truth. Where did this Chase information come from? Why am I being accused of a crime that happened somewhere [that] has nothing to do with me. I've been asking for dialogue for three years." (9/19/2023 Transcript at 20).

The defendant's failed attempt to plead guilty on the eve of trial provides an emblematic example of his repeated attempts to deceive the Court and interfere with the judicial process throughout the course of this matter.  Far from taking responsibility, the defendant used this hearing as another opportunity to try to peddle lies and misinformation to the Court.  Throughout his dubious attempt at an allocution, the defendant unequivocally and repeatedly stated that he had no role in defrauding banks or receiving customer information from bank employees, and that his conduct was limited to receiving information from the "dark web" that he later sold to others.  He repeatedly claimed he had no knowledge of what others might have done with the information, as it was none of his concern.  Aside from failing to establish the elements of the offenses for which he was charged, the defendant's attempted allocution contradicted virtually all the Government's evidence establishing the defendant as the leader and mastermind of a widespread bank fraud and identity theft scheme who had personally recruited multiple bank insiders working at his direction. The following are noteworthy excerpts showing the defendant's efforts to blatantly lie to the Court and minimize his conduct, under oath, in the context of his failed plea allocution.

> THE COURT: Well, did you as a result of the activities that we just described, did you receive some money?
>
> THE DEFENDANT: No.
>
> ********************
>
> THE DEFENDANT: Well, that's what -- this is – it's information that people would pay for. I don't know what they do with the information. I didn't ask.
>
> ********************
>
> MR. COYLE: Your Honor, did he understand that that information would be used to steal money from a bank?
>
> THE DEFENDANT: No. What you do with the information is on you. You could get a car, a house. You can get a skate board. I have nothing to do with what you do with information once it's in your hands. I don't control that.
>
> ********************
>
> THE COURT: Why do you think people were paying you for that information?
>
> THE DEFENDANT: Well, I can't think of what someone is going to do with that information. That has nothing to do with me. It doesn't.
>
> THE COURT: Well, hold on. So, you knew that they were paying you for that information for some improper purpose, yes?

THE DEFENDANT: I don't know.

THE COURT: Well, why would they be paying you for information about other people if their purposes were legit?

THE DEFENDANT: Once again, your Honor, if my business is with, hypothetically, just with you is, hey, I need information or I would like information for this type, okay. This is that, what you do with that information afterwards, I don't inquire.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

THE COURT: What was the nature of this information? What kind of information are we talking about?

THE DEFENDANT: Whatever they send. I don't know.

THE COURT: Well, if you were going to sell it, you had to know something about it.

THE DEFENDANT: Well, you only can get what people request. I don't know those people. So, I don't know what I'm asking for. Once it's sent to me it's like, okay, now – it's not from a banker or someone that's like this – I've never texted her to get information. There is no dialogue of that. So that is what I'm trying to figure out. Who is this woman that you are trying to connect me with. There's no dialogue of that. I'm confused. Where is this dialogue between me and this woman at this bank that says give me this and I'll give you this? That's what I'm confused about.

THE COURT: You told me a minute ago repeatedly that you agreed with at least one other person to obtain information that you knew was improper or was going to be used improperly, yes?

THE DEFENDANT: Yes.

THE COURT: Okay. So, what kind of information was it?

THE DEFENDANT: Just information that could have been first and last name, date of birth, address, your social, ***but none of that came from this woman at Chase Bank.***

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

THE COURT: Well, let me inquire a little bit further of Mr. Wells. Mr. Wells, some of this information you got by use of electronic devices. I think you told me the dark web.

THE DEFENDANT: Yeah, the dark web. People sell it.

THE COURT: They sell it through electronic --

THE DEFENDANT: Through the dark web. They get the information. Cool. How much? Fifty bucks.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MR. COYLE: And, your Honor, to be fair here, the reason we are kind of trying to think at this stage whether that actually fits into these elements is because what he is saying does not at all fit within the evidence that the government would use to prove this case. It doesn't fit with any theory of our understanding of what he actually did.

THE COURT: They're going to claim, as I understand it -- and the government will correct me if I'm wrong – that you obtained information about customers of the Chase Bank through people, employees at Chase Bank who you induced to give you this information, correct?

MR. COYLE: Yes.

THE COURT: It's a question of did you, as part of your conspiracy, did you seek to obtain from people at Chase Bank --

THE DEFENDANT: *No, sir.*

THE COURT: So you got all this information through the dark web?

THE DEFENDANT: Your Honor, everything that is in all three phones --

THE COURT: I'm not asking what's on – I'm asking you what you know is the truth, is what I'm asking.

THE DEFENDANT: Okay. Go ahead. What's your question?

THE COURT: *So, is it a fact or not? Forget about what's in the phone. Is it a fact or not that you asked people at Chase Bank for information regarding customers?*

THE DEFENDANT: *No, sir.*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MR. MCGORTY: Your Honor, I actually have to stand up for my client. I understand that what he [is] articulating is not the breadth of the government's proof in the case but he is articulating guilt to crime, which is accepting money in exchange for participating in a scheme to defraud a bank. That's not the way the government says he did it and --

THE DEFENDANT: *Well, let me cut you off because I didn't receive money from anyone to defraud a bank.* If I obtained information and I resell that information or if someone else it to me for 50 and I resell it for 100, what you do with that information, whether you go to a bank, a dealership or a home or you go by a jet ski, that's your business.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

THE DEFENDANT: That's what I was trying to tell my attorneys. It's like, That's possession. ***All I did truthfully was resell the information I got off the dark web. That's all I did.***

(9/18/2023 Transcript at 19-36, emphasis added).  After approximately two hours of trial testimony the following day, including that of Ms. Robbins, the defendant changed his story and successfully allocuted to the charged offenses.

In consideration of all of the circumstances in this matter, a sentence of 180 months' imprisonment is sufficient, but not greater than necessary, to achieve the purposes of sentencing. Such a sentence is necessary to protect the public from future crimes of the defendant and provide individual deterrence, as the defendant has repeatedly shown that conviction after conviction for the same type of offense will not stop his continuous, decade-long pattern of criminal activity. Such a sentence also is sufficient, but not greater that necessary, to account for the seriousness of the offense and provide general deterrence, given the breadth and degree of the personal and financial harm the defendant has caused to his victims and those he manipulated into participating in his scheme.  Finally, a sentence of 180 months' properly accounts for the characteristics of the defendant, who has demonstrated himself to be an unrepentant serial fraudster on an extraordinary scale.

[continued on following page]

## C. Conclusion

As described above, the defendant callously manipulated people to help him perpetrate his fraud.  He has caused immense personal and financial harm.  He has engaged in the same pattern of fraudulent conduct since at least 2011, earning him the highest criminal history category possible under the Sentencing Guidelines.  He has served seven custodial sentences for similar conduct, and has remained undeterred, continuing to carry out the same fraudulent scheme time and time again.  He blatantly and repeatedly tried to deceive the Court and obstruct the proceedings against him up until the morning of trial.  The defendant even taunted a co-conspirator by telling her that even if she were to cooperate with authorities and provide information against him, he would nonetheless beat the case or receive a minimal sentence.  That same co-conspirator did in fact testify against him, the sole person he enlisted in his scheme who had the opportunity to do so before the defendant pled guilty.  The defendant's sentence must demonstrate that the scale of his criminal activities and harm he has caused to both his victims and those he deceived and manipulated will be met with serious consequences.  A sentence of 180 months' is sufficient but not greater than necessary to achieve the purposes of sentencing in this case.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York


by: _____/s/_____
Jeffrey W. Coyle
Katherine Cheng
Alexandra Rothman
Assistant United States Attorneys
(212) 637-2437


Cc:   Kelly T. Currie, Esq.
Glen G. McGorty, Esq.
Danielle L. Giffuni, Esq.
Jessica Franzetti, Esq.