UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                  Plaintiff,

      -against-

LAURELL WELLS,

                  Defendant.

**S1 20 Cr. 0633 (JSR)**

**SENTENCING MEMORANDUM
ON BEHALF OF LAURELL WELLS**

Kelly T. Currie
Glen G. McGorty
Danielle L. Giffuni
Jessica L. Franzetti
CROWELL & MORING LLP
590 Madison Avenue
New York, NY 10022
(212) 223-4000

*Attorneys for Laurell Wells*

**TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ....................................................................... 1

II.    PROCEDURAL HISTORY............................................................................ 2

III.   WELLS' PERSONAL BACKGROUND AND CHARACTER ........................................ 3

       A.    MR. WELLS' CHILDHOOD AND PLACEMENT INTO FOSTER
             CARE ......................................................................................... 3

       B.    MR. WELLS' POST-FOSTER CARE YOUNG ADULTHOOD ........................ 5

       C.    MR. WELLS' ROLE AS A FATHER ...................................................... 6

       D.    MR. WELLS' EFFORTS TO CHANGE HIS LIFE WHILE
             INCARCERATED ............................................................................ 7

IV.    SENTENCING CONSIDERATIONS ................................................................ 9

       A.    RELEVANT SENTENCING CONSIDERATIONS........................................ 9

       B.    THE SECTION 3553(A) FACTORS WARRANT A SENTENCE OF
             TIME SERVED .............................................................................. 10

             1.    THE GOVERNMENT'S LOSS CALCULATION OVERSTATES
                   THE LOSS AMOUNTS ........................................................ 11

             2.    MR. WELLS SHOULD RECEIVE A SENTENCE OF TIME
                   SERVED TO AVOID UNWARRANTED SENTENCING
                   DISPARITIES.................................................................... 12

             3.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE
                   COUNSEL IN FAVOR OF A SENTENCE OF TIME SERVED .......... 14

             4.    MR. WELLS' HISTORY AND PERSONAL
                   CHARACTERISTICS WARRANT A SENTENCE OF TIME
                   SERVED ......................................................................... 15

             5.    A TIME SERVED SENTENCE IS SUFFICIENT PUNISHMENT ....... 17

V.     CONCLUSION...................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Gall v. United States*,
    552 U.S. 38 (2007)........................................................................................9, 10

*Kimbrough v. United States*,
    552 U.S. 85 (2007)............................................................................................9

*Nelson v. United States*,
    555 U.S. 350 (2009) (per curiam).....................................................................10

*Rita v. United States*,
    551 U.S. 338 (2007)..........................................................................................10

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006),
    *aff'd*, 301 F. App'x 93 (2d Cir. 2008)........................................................10, 13

*United States v. Algahaim*,
    842 F.3d 796 (2d Cir. 2016)..............................................................................13

*United States v. Booker*,
    543 U.S. 220 (2005)............................................................................................9

*United States v. Deutsch*,
    987 F.2d 878 (2d Cir. 1993)......................................................................... 11-12

*United States v. Emmenegger*,
    329 F. Supp. 2d 416 (S.D.N.Y. 2004)..............................................................12

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012),
    *aff'd*, 747 F.3d 111 (2d Cir. 2014)..............................................................13, 14

*United States v. Hakim*,
    21 CR. 259 (LJL-1) (S.D.N.Y. 2023) ..............................................................13

*United States v. Johnson*,
    No. 16-CR-457-1 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018)........13, 14

*United States v. Kumar*,
    617 F.3d 612 (2d Cir. 2010)..............................................................................11

*United States v. Reifler,*
   446 F.3d 65 (2d Cir. 2006)..................................................................12

*United States v. Wells*
   (S.D.N.Y. Nov. 13, 2020), ECF No. 1................................................2

*United States v. Wells*
   (S.D.N.Y. Nov. 18, 2020), ECF No. 27..............................................2

*United States v. Wells*
   (S.D.N.Y. Nov. 24, 2020), ECF No. 10..............................................2

*United States v. Wells*
   (S.D.N.Y. Sept. 18, 2023)..................................................................12

*United States v. Wells*
   (S.D.N.Y. Sept. 19, 2023)............................................................15, 17

*United States v. Williams,*
   247 F.3d 353 (2d Cir. 2001)..............................................................11

**Statutes**

18 U.S.C. § 1028A............................................................................................2

18 U.S.C. §§ 1028A(a)(1), 1028A(b)..............................................................2

18 U.S.C. §§ 1028A(a)(1), 1028A(b), and 2 ...........................................*passim*

18 U.S.C. §§ 1343 and 1349............................................................................2

18 U.S.C. §§ 1344 and 2..................................................................................2

18 U.S.C. § 1349..............................................................................................2

18 U.S.C. § 3553(a)(2).....................................................................................9

18 U.S.C.§ 3553(a)(2)(A)-(D)........................................................................18

18 U.S.C. § 3553(a)(6)...................................................................................12

18 U.S.C. § 3553(a)(l)-(7)..............................................................................10

United States Code, Section 3553(a) Title 18..........................................*passim*

U.S.S.G. Section 2B1.1..................................................................................14

U.S.S.G. § 2B1.1(b)(17)(A)...........................................................................11

Through counsel, defendant, Laurell Wells, respectfully submits this Sentencing Memorandum and accompanying exhibits to assist the Court in determining an appropriate sentence in this matter.

## I.    PRELIMINARY STATEMENT

Foster children are destined to grown up in uncertainty, often not knowing where they will wake up the next day or if they will be safe at night.  That was true for Laurell Wells.  Growing up in the foster care system, shuffled from one institution to another with little oversight and no stability, Mr. Wells unfortunately, but not surprisingly, turned to a life of delinquency and crime. Mr. Wells has undoubtedly exercised poor judgment in his life.  But after enduring immense hardship during three years of difficult pre-trial detention, Mr. Wells has had time to reflect on his poor decisions and he is motivated to lead a law-abiding life so he can be a present and involved father to his children.  While in custody, he has remained out of trouble and undertaken concrete steps to turn his life around, for himself, and for his young children.  Mr. Wells does not want miss their childhood, like his parents missed his.  To say that Mr. Wells' childhood was traumatic is an understatement—his mother was an abusive drug addict and his father was completely absent from his life.  He suffered physical and verbal abuse by his drug-addicted mother and her romantic partners.  As a result of the abuse, Mr. Wells was removed from his mother's custody and placed in the foster care system where he spent seven years until he "aged out" of the system, never being reunited with his biological parents and never adopted by another family.  While his past is not an excuse for his crimes, it serves to provide important context for how Mr. Wells ended up on the wrong path.  Mr. Wells comes before the Court penitent, respectful and fully prepared to live a productive, law-abiding life.  Accordingly, in light of all the factors pursuant to Title 18, United States Code, Section 3553(a), we respectfully request that Mr. Wells be sentenced to time served—

having already served 36 months in pre-trial detention—which is no greater than necessary to achieve all of the goals of sentencing.

## II.    PROCEDURAL HISTORY

On November 13, 2020, the Government filed a sealed Complaint charging Mr. Wells and Georgia Ward, Mr. Wells' life partner, with one count of conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. § 1349, and one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A.  *See* Complaint, *United States v. Wells*, (S.D.N.Y. Nov. 13, 2020), ECF No. 1.  Mr. Wells was arrested on November 18, 2020, and placed in pre-trial detention.  His subsequent applications for bail were denied.  Ms. Ward was released on bail on November 18, 2020.  *See* Appearance Bond Entered as to Georgia Ward, *United States v. Wells*, (S.D.N.Y. Nov. 18, 2020), ECF No. 27.

On November 24, 2020, a grand jury returned a two-count Indictment charging Mr. Wells and Ms. Ward with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, as well as aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b).  *See* Indictment, *United States v. Wells*, (S.D.N.Y. Nov. 24, 2020), ECF No. 10.  On September 14, 2021, and later, on August 24, 2022, Mr. Wells submitted motions to suppress evidence obtained from phones that were seized by the Government in connection with two arrests for traffic violations.  Both motions were denied.  On March 29, 2022, Ms. Ward pleaded guilty to count one in the Indictment, conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.

The Government filed a Superseding Indictment on June 12, 2023, charging Mr. Wells with conspiracy to commit wire fraud and bank fraud in violation of 18 U.S.C. §§ 1343 and 1349, bank fraud in violation of 18 U.S.C. §§ 1344 and 2, and aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b), and 2.  *See* PSR ¶ 1.

2

Two weeks prior to the scheduled start of trial in this matter in July 2023, the Government disclosed to the defense that the lead investigating officer, former NYPD Detective Cliford Spell, engaged in an illicit sexual relationship with Faith Brewster, a central witness and an unindicted co-conspirator in the Government's case.   As a result of this disclosure, Mr. Wells, through counsel, requested that the Court adjourn the trial in order to allow time to investigate these new facts, and subsequently moved to suppress evidence from Wells' cell phones and a dating website resulting from court-ordered searches where the warrant affidavits relied in part on Detective Spell's investigation.   The Court adjourned the trial until September 19, 2023, and held an evidentiary hearing on September 5, 2023.   Following the hearing, the Court denied the motions to suppress.

On September 19, 2023, this Court commenced trial in this case.   Midway through the first day of trial, Mr. Wells pleaded guilty before this Court to all three counts of the Superseding Indictment without the benefit of a plea agreement.   *See* PSR ¶ 6.   Mr. Wells' sentencing is scheduled for December 19, 2023, at 3:30 p.m.

## III.   WELLS' PERSONAL BACKGROUND AND CHARACTER

### A.   Mr. Wells' Childhood and Placement into Foster Care

Mr. Wells is thirty-seven years old.   *See* PSR ¶ 116.   His early childhood was indelibly marred by his parents' drug abuse, violence, abandonment and financial insecurity.   Mr. Wells was born in New York City to Tanya Brown and William Wells.   *See id*.   His mother gave birth to him when she was only twenty years old.   Mr. Wells has one biological sister.   *See id*.   He has a younger half-brother, Alvin, that his mother had with another man named Kevin Perales, and his father had sixteen children with other women.   *See* PSR ¶ 118.

Mr. Wells grew up in the Bronx with his mother and younger half-brother, Alvin.  His parents were never legally married and he rarely saw his father.  *See* PSR ¶ 119.  His father never provided child support and did not play a meaningful role in his upbringing.  *See id*.  Mr. Wells recalls seeing his father approximately once a year; he would sometimes run into him on the street and recalled wondering why his father would not visit him although he lived nearby.  Mr. Wells' mother was unemployed while he was growing up and suffered from diabetes.  *See id*.  She abused drugs—PCP and crack—and relied entirely on public assistance to support herself and her children.  *See id*.

At various times, a boyfriend of Mr. Wells' mother would also live in the home.  When Mr. Wells was nine or ten years old, his mother's boyfriend broke his mother's jaw.  *See* PSR ¶ 120.  Mr. Wells' sister left home as a teen to live with their aunt because another one of his mother's boyfriends physically abused her.  *See* PSR ¶ 119.  Mr. Wells was also abused by his mother and her romantic partners.  *See id*.  When Mr. Wells' best friend's mother learned of the abuse in the home—which included Mr. Wells' mother throwing objects at him causing physical scars on his face—she reported it to the Administration for Children's Services ("ACS").  *See id*.  As a result of the physical and verbal abuse, when Mr. Wells was eleven or twelve years old, he was placed into the foster care system.  *See* PSR ¶ 120.  Unfortunately, this intervention did not result in a more stable environment for Mr. Wells.  A month after Mr. Wells was taken into foster care, his brother, Alvin, was also removed from their home and placed in foster care.  *See id*.  The two boys were placed at St. Dominic's Family Services, a foster care facility in the Bronx.  One month later, Mr. Wells was moved to another foster care facility and he and Alvin were separated. *See id*.  Alvin went to live with a foster family, while Mr. Wells was left alone bouncing between

facilities until he "aged out" of the system.  He never had the good fortune of being adopted by a foster family and tragically, Mr. Wells' mother never made any effort to get him back.

After losing connection with Alvin as a child, Mr. Wells was only able to locate and reconnect with his half-brother twenty years later.  *See id.*  This was significant for Mr. Wells because by the time he reconnected with Alvin, he had already suffered significant loss in his life. When Mr. Wells was a child, his best friend was accidentally crushed and killed while "elevator surfing" in his housing project.  Mr. Wells recalls learning the news of his friend's death while "crashing" on his father's couch, already feeling like a burden.  He was forced to suppress his emotions over fear that his father would beat him for showing any weakness when mourning the loss of his closest friend.

While Mr. Wells has repressed much of the unspeakable trauma of his childhood, he suffered additional loss when both his parents died when Mr. Wells was in his early twenties.  In 2007, when Mr. Wells was only twenty-two or twenty-three years old, his father died unexpectedly of lung cancer.  *See* PSR ¶ 117.  Then, on October 4, 2010, when Mr. Wells was twenty-five years old, his mother died suddenly of a brain aneurism in her home.  *Id*.  Mr. Wells' childhood experience of loss, abandonment, abuse and drugs sheds important light into his descent into criminal activity.

### B.     Mr. Wells' Post-Foster Care Young Adulthood

Given his tumultuous upbringing, Mr. Wells attended high school only until the eleventh grade.  *See* PSR ¶ 136.  To his credit, and indicative of his desire to better himself, Mr. Wells has since completed his GED.  *See* PSR ¶ 135.  While Mr. Wells was in foster care, and at only fifteen and sixteen years old, he was charged and convicted of criminal possession and later, criminal sale of a controlled substance.  *See* PSR ¶¶ 67-74.  Following several additional charges for drug

possession when he was eighteen to twenty years old, Mr. Wells has not had any involvement with drugs. *See* PSR ¶¶ 75-82. He saw from a young age the devastating impact that illegal drugs had on his mother and he did not want to end up that way. After Mr. Wells left foster care, he initially went to live with his sister in the Bronx. Though, like his time in the foster care system, he never stayed in one place for long; he bounced between different family members and girlfriends.

Mr. Wells has held numerous jobs in restaurants and at retail stores, but he never found his calling. Prior to 2007, Mr. Wells worked at the Burger King at 86th Street and Lexington Avenue; then in 2007, he worked at IHOP as a busser. *See* PSR ¶¶ 153-156. Beginning in 2008 to 2010, he worked part-time at Lucky Brand; he later worked part-time at Zara, Shoegasm, and Aerosols. *See* PSR ¶¶ 141-146 and 151-152. In approximately 2012 or 2013, Mr. Wells worked at L'Occitane where he worked his way up to be an assistant manager. *See* PSR ¶¶ 138-139. He enjoyed working at L'Occitane but was ultimately let go due to his criminal history. He does not believe he would currently be incarcerated if he had been able to continue his employment, providing his life with needed stability and security.

### C.    Mr. Wells' Role as a Father

Mr. Wells is in a serious committed relationship with Ms. Ward. *See* PSR ¶ 123. They have been together since 2015 and have two children: L.W.J., who is six years old and is autistic and L.W., who is two years old. *See id*. Mr. Wells' younger child was diagnosed with Tetralogy of Fallot, a serious condition involving a malformed heart that necessitates frequent doctor visits. *See id*. L.W. has already undergone heart surgery for this condition. *See id*. Prior to his incarceration, Mr. Wells lived with Ms. Ward and their children and played an active role in his children's life. Mr. Wells describes his relationship with Ms. Ward as healthy, and hopes to provide financial support to her and their children when he is released. From his own unfortunate

experience, Mr. Wells knows the harm that the lack of parental care can cause a child, and he is determined to provide his children with the support and love that he did not receive. Mr. Wells' support of his family is especially needed because Ms. Ward was recently diagnosed with Lupus.

In addition to his children with Ms. Ward, Mr. Wells also has a son, D.N., who is seventeen years old, and a daughter, P.H., who is nine years old. *See* PSR ¶¶ 121-122. Before Mr. Wells was incarcerated, he spoke regularly to his daughter P.H., and he hopes to reconnect with D.N. once he is released.

### D.    Mr. Wells' Efforts to Change His Life While Incarcerated

Despite seemingly insurmountable obstacles, Mr. Wells has a relentless determination to continue striving, even in the face of hardship. From the inception of his case and throughout his detention, he was actively involved in the research and strategy of his defense. He routinely researched case law, read the discovery materials submitted by the Government, and as this Court is aware, was extremely passionate about crafting his defense. This Court thoughtfully engaged in discussions with Mr. Wells on many occasions. Mr. Wells also devoted his time to filing motions and drafting letters to this Court concerning the status of his case which has persisted through three years and at least as many sets of attorneys.

In addition to Mr. Wells' efforts in the defense of his case, he has also worked tirelessly on improving himself. Prior to his arrest, he was trying to find his purpose. For the first time in his life, he had the chance to genuinely reflect on his life—and he knows he wants to change its direction. Because of his upbringing, Mr. Wells understands that he sees the world through a different lens. A lens that was forced to deal with the confusing and harrowing experiences of being torn away from his community and relying entirely on himself to survive in the foster care system. After losing his job because of his criminal history during the toughest period in his life,

he stopped investing in himself and turned to crime.  Mr. Wells learned through this experience that he needs to invest in himself again—not just to change his life, but the life of his family.  While in pre-trial detention, Mr. Wells has done everything in his power to take advantage of the opportunities available for inmates (which, as the Court knows, are far different than at a long-term federal facility).  He successfully completed a parenting course, a six-week anger management course, and a CPR course.  In addition to taking courses, Mr. Wells worked as a chef during his entire time incarcerated in Essex County.

Most significantly, Mr. Wells took a business course while in detention where he learned how to start a business and form an LLC.  When released, he plans to apply for government grants available to individuals reentering society after incarceration.  As should be no surprise to this Court, Mr. Wells has spent a significant amount of time researching these programs, and intends to use these grants to open a frozen yogurt truck in the Bronx to offer something that is different in the hopes of bringing some joy to the community.  He used his commissary money to order books about the frozen yogurt industry, and he is extremely passionate about starting his own business.  He intends to service high-traffic areas, such as the Bronx County Courthouse and Yankee Stadium.  Mr. Wells acknowledges that this is different work than he has done in the past but he feels genuinely excited about the creativity it entails and the opportunity to be his own boss.

Mr. Wells is eager to provide financial support for his family and spend time with his children, whom he speaks to as often as he is permitted.  Mr. Wells accepts that it was his own poor decisions that took him away from his children but he is committed to being present in their lives when he leaves pre-trial detention.

## IV.   SENTENCING CONSIDERATIONS

### A.   Relevant Sentencing Considerations

In determining M r. W ells' sentence, the Court considers a broad range of statutory sentencing factors, along with the advisory Guidelines. *United States v. Booker*, 543 U.S. 220, 245-46 (2005); 18 U.S.C. § 3553(a) (2018). The Court must impose a sentence sufficient but not greater than necessary to achieve the objectives of sentencing. 18 U.S.C. § 3553(a); *see Kimbrough v. United States,* 552 U.S. 85, 89 (2007); *Gall v. United States*, 552 U.S. 38, 55-57 (2007). The goals of sentencing as set forth in section 3553(a)(2) are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)   to afford adequate deterrence to criminal conduct;

(C)   to protect the public from further crimes of the defendant; and

(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).

In making an individualized assessment necessary to meet the goals of sentencing, the Court must contemplate, consider, and give appropriate weight to the following factors, pursuant to section 3553(a): (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (3) the kinds of sentences available; (4-5) the applicable sentencing Guideline range and Sentencing Commission (the "Commission") policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants who have been

found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(l)-(7).

After determining the advisory Guidelines range, the Court must next independently determine whether an appropriate sentence meets the goals of sentencing in light of the section 3553(a) factors, and must consider arguments that the advisory Guidelines should not apply on various policy or case specific grounds. *See Rita v. United States*, 551 U.S. 338, 347-51 (2007). While the Court is required to take account of the advisory Guidelines together with other sentencing factors, it may not presume that the advisory Guidelines range is reasonable. *See Gall,* 552 U.S. at 50; *Nelson v. United States*, 555 U.S. 350, 351-52 (2009) (per curiam) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.") (emphasis in original); *United States v. Adelson,* 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (holding that "where, as here, the calculations under the Guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences.").

After considering the Section 3553(a) factors, and the time Mr. Wells has served since his arrest, Mr. Wells respectfully requests that the Court sentence him to time served.

## B.   The Section 3553(a) Factors Warrant a Sentence of Time Served

The advisory Guidelines calculation is only one of many factors that the Court must consider when fashioning an appropriate sentence. *See Gall*, 552 U.S. at 49 (acknowledging that a court must consider the Guidelines as "the starting point and the initial benchmark[,]" but that the advisory Guidelines range is "not the only consideration" in a court's determination of a

sentence).  The Court must conduct an independent review of the factors set forth in 18 U.S.C. § 3553(a) in each case as well.  The Court must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Id*. at 52 (citing *Koon v. United States*, 518 U.S. 81, 113 (1996)).

1.    **The Government's Loss Calculation Overstates the Loss Amounts**

The Government initially alleged that the loss amount attributed to this conspiracy was between $1.5 million and $3.5 million based on an analysis conducted by JPMorgan Chase ("JPM").  When the defense objected to the loss calculation as lacking adequate support, the Government conceded that it could not prove the original loss amount and are now willing to proceed on a loss amount of approximately half a million dollars.  *See* Addendum to the PSR at 37 (¶¶ 44, 48, and 56).  The Government further modified its original assertion that the defendant individually derived more than $1,000,000 in gross receipts from one or more financial institutions under U.S.S.G. § 2B1.1(b)(17)(A).  *Id*.  The Government now alleges that the $500,000 loss amount includes (1) approximately $207,000 that the defense agrees was the conduct from the S1 Indictment Mr. Wells pled guilty to, involving JPM, Regions Bank and M&T Bank between 2017 and 2020, the period charged in the S1 Indictment, and (2) approximately $297,150 stemming from conduct that allegedly occurred between 2012 and 2013 at JPM.  *Id*.

Indeed, the government bears the burden of proving the facts relevant to sentencing by a preponderance of the evidence.  *United States v. Williams*, 247 F.3d 353, 358 n.7 (2d Cir. 2001). While the loss amount does not need to be calculated with "precision," the sentencing court's estimate of the loss must be reasonable.  *United States v. Kumar*, 617 F.3d 612, 632 (2d Cir. 2010). Importantly, a sentencing court must also not engage in speculation.  *United States v. Deutsch*, 987

11

F.2d 878, 886 (2d Cir. 1993). *See also United States v. Reifler*, 446 F.3d 65, 134 (2d Cir. 2006) (Noting that a loss amount based on unproven assumptions cannot be rendered correct by simply reducing the amount, where that reduced amount is also based on unproven assumptions). Without providing competent evidence to tie Mr. Wells to the alleged loss amount of $500,000, the Government is asking this Court to impermissibly speculate and rely on a guideline range that is based at least in part on unproven assumptions. If the Government wants a hearing to offer evidence to press the additional $300,000 in loss beyond that charged in this case to which Mr. Wells accepted responsibility in his plea allocution—which will increase the Guidelines offense level by two—the defense expects the Government will advise the Court of that intention.

2. **Mr. Wells Should Receive a Sentence of Time Served to Avoid Unwarranted Sentencing Disparities**

Under Section 3553(a), the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6). While Mr. Wells does not discount the seriousness of his offenses, all of his crimes were non-violent where the majority of the harm caused was to large financial institutions. This Court has previously noted the difference between loss incurred by financial institutions rather than individual victims, noting, that while institutions can also suffer, it is of considerably lesser importance than the impact on individuals. *See* Transcript of Sealed Record at 23, 24-35 and 24, 1-4, *United States v. Wells,* (S.D.N.Y. Sept. 18, 2023). Consistent with this Court's views, other District Judges in this Circuit have also criticized the Guidelines for placing "excessive weight on [the fraud loss] factor," as it frequently is a relatively week indicator of the moral seriousness of the offense or the need for deterrence. *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-428 (S.D.N.Y. 2004). Notably, the Second Circuit has endorsed variances where enhancements based on loss amount have led to overly-punitive sentences. *See*

*United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016).  Courts in this District and the Eastern District have imposed Guideline variances leading to lesser sentences even in instances where the fraud has harmed individual victims rather than large financial institutions.  In *United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *1 (E.D.N.Y. Apr. 27, 2018), the defendant was convicted on eight counts of wire fraud and one count of conspiracy to commit wire fraud, and was estimated to have gained between $1.5 and $3.5 million as a result of his crimes. The court imposed a 24-month sentence.  *Id*. at *6.  *United States v. Hakim*, 21 CR. 259 (LJL-1) (S.D.N.Y. 2023), provides another recent example.  In *Hakim*, the defendant participated in an international wire fraud conspiracy that left at least 15 people and entities with over $1.4 million in losses.  Hakim was charged with four counts: wire fraud conspiracy, wire fraud, conspiracy to commit money laundering, and money laundering.  Ultimately, Hakim was only sentenced to 24 months in prison and another six months of home detention.  While the defendants in *Johnson* and *Hakim* had lower Guidelines ranges than Mr. Wells (in part due to Wells' criminal history including drug possession convictions when young), their crimes had higher loss amounts than the Government alleges here.

This Court has also imposed sentences for fraud-related offenses that fall far below the Guidelines.  In *United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014), this Court calculated that the defendant's actions resulted in an illegal gain or avoidance of loss of $5,032,195, which would have resulted in an eighteen-point enhancement, but nevertheless imposed a sentence of 24 months.  *See Gupta*, 904 F. Supp. 2d at 353, 355. Similarly, this Court, in *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), in a case with a far greater loss amount, also imposed a sentence far below the Guidelines.  In *Adelson*, the Government alleged there were more than 250 victims and this Court concluded that the measure

13

of intended loss was between $50 to $100 million.  *Id*. at 510.  Along with others, these factors led to a total adjusted Guidelines score of 46, which this Court aptly noted was above the 42-level threshold for life imprisonment under the Guidelines, and commented that, "[e]ven the Government blinked at this barbarity."  *Id*. at 511.  This Court ultimately sentenced the defendant to 42 months' imprisonment.  *Id.* at 507-08.  Here, while the parties may disagree on the total loss amount, if the Court imposed a sentence of time served in this case, Mr. Wells would still have served 12 months more than the defendant in *Gupta*, despite a loss amount of more than ten times the alleged loss amount in this case.  Moreover, Mr. Wells' Guideline range is driven by the 12-level enhancement for the loss amount of approximately half a million dollars under U.S.S.G. Section 2B1.1, which courts have recognized as empirically unsound and can produce draconian results.  *Johnson*, 2018 WL 1997975, at *3-4.  Thus, to avoid unwanted sentencing disparities with similarly situated defendants, the above factors counsel in favor of a below-Guidelines sentence of time served.

3.  **The Nature and Circumstances of the Offense Counsel in Favor of a Sentence of Time Served**

On September 19, 2023, Mr. Wells stood before this Court, having accepted responsibility for the crimes of which he was accused, and pleaded guilty to the serious crimes of conspiracy to commit wire fraud and bank fraud, bank fraud and aggravated identity theft.  He did so because he orchestrated a scheme to earn money by agreeing with others to commit fraud by depositing phony checks at banks.  As part of his scheme, Mr. Wells used the identities of real people who had not given permission for their identities to be used for these fraudulent purposes.  He subsequently received at least part of the proceeds of the fraud.  He deeply regrets the impact his conduct may have had on these individuals, and the community.

Most crucially, while Mr. Wells did use real individual's identifications, he never intended to cause financial harm to any individuals.  In fact, the large financial institutions where Mr. Wells and his co-conspirators cashed the checks incurred the vast majority of the financial loss.  At trial on September 19, 2023, the Government's first witness—representing an entity whose identity was misappropriated on the fraudulent checks—confirmed this point and testified that, "there were no deductions from our account based on these checks."  *See* Transcript of Record at 70, 21-22, *United States v. Wells*, (S.D.N.Y. Sept. 19, 2023).

Mr. Wells' sole motivation in committing these crimes was to obtain money to support himself and his family when he felt he had no other opportunities for legitimate employment. While this does not diminish the wrongfulness of Mr. Wells' actions, there is a notable distinction, as this Court has highlighted, between individual victims suffering financial loss and large financial institutions incurring financial loss.

Now, having had the time and clarity to reflect on the gravity of his offenses, Mr. Wells stands before this Court profoundly remorseful for his actions, and focused on putting the past behind him.

4.  **Mr. Wells' History and Personal Characteristics Warrant a Sentence of Time Served**

While Mr. Wells' conduct in this case is undoubtedly serious, a number of personal factors about his background warrant important consideration by the Court, including, Mr. Wells' unstable and traumatic upbringing, his sincere remorse, his desire to cultivate a deeper relationship with his children, and his commitment to living an upstanding, law-abiding life going forward.

Mr. Wells' childhood and young adulthood did not provide him with a positive foundation. His mother was a drug user, his father was wholly absent from his life, and Mr. Wells was separated from his nuclear family due to drug use and abuse by his mother and her boyfriend.  Mr.

15

Wells entered the foster care system but was never adopted, rather, he remained in a foster care facility from the formative parts of his childhood through his entrance into adulthood. For as long as he can remember, he lived his life on his own. He lacked the love, support, and constant presence that a nuclear family provides. Mr. Wells accepts responsibility for the offenses he committed during his youth. Similarly, he takes full responsibility for the instant offenses. He regrets that he committed these crimes and yearns for the chance to lead a better life. Indeed, despite his criminal history, he has never faced such a period of incarceration and his distressing experience within the federal system has emboldened him to change his life.

There are a couple points worth noting here. First, despite all that has come before, the Mr. Wells which Your Honor has come to know has risen above the trauma of his youth and all the bad choices he made. He stood before this Court on many occasions over the past nine months seeking justice—often when he felt the Court or his counsel (past and present) were not listening. For years, Mr. Wells believed that Detective Spell's investigation of his case was unlawful, including the representations Detective Spell had made which led to the seizure of his cellphones in this case. Ultimately, it came to light that Detective Spell was a corrupt police officer who abused his position of power, engaged in an illicit sexual relationship with a criminal defendant, failed to collect critical evidence in this matter and then deceived the prosecutors by withholding discovery to protect himself and continue his illicit affair. While ultimately Detective Spell's transgressions did not translate into relief for Mr. Wells in the instant case, the discovery of Detective Spell's significant misconduct vindicated the concerns Mr. Wells had raised all along.

Similarly, it has always been Mr. Wells' belief that the Government vastly overstated the gain derived from the fraud conspiracy. The Government's recent decision to abandon its argument that Mr. Wells was responsible for multi-million-dollar losses by the financial

16

institutions justified Mr. Wells' steadfast position that the Government was overstating the extent of his criminal conduct.

Finally, although the Government may argue that Mr. Wells' decision to plead guilty only after proceeding to trial undermines his acceptance of responsibility for his crimes, the record indicates otherwise.  On this point, and many others over the last nine months, Mr. Wells sought and followed the Court's guidance.  Mr. Wells took to heart Your Honor's advisement that he would suffer no penalty for putting the Government to its proof at trial.  At trial, Mr. Wells did not wait until the Government put in its entire case before entering a guilty plea.  Midway through the first cooperating witness' testimony, Mr. Wells understood the Government's case with great clarity and, after self-reflection, realized that the appropriate course was to immediately notify the Court that no additional proof was required.  When Mr. Wells did plead guilty, he provided his allocution and accepted responsibility for his actions—an action for which the Court praised him at the time, stating, "Mr. Wells, I think you did the right thing."  *See* Transcript of Record at 103, 25, *United States v. Wells*, (S.D.N.Y. Sept. 19, 2023).

In sum, while Mr. Wells may have challenged everyone in the Courtroom at various times, his actions provided Your Honor with insight into a man who has risen past the trauma of his youth, and a lifetime of bad choices.  He is an intelligent, determined person who has great potential, as Your Honor appeared to sense in your painstaking and patient colloquies with him. We respectfully submit that this Court consider these factors when assessing the appropriate sentence here.

### 5.    A Time Served Sentence is Sufficient Punishment

In fashioning an appropriate sentence, the Court must ensure that the sentence reflects the seriousness of the offense, promotes respect for the law, serves as just punishment, affords

adequate deterrence, and protects the public from further crimes of the defendant.  *See* 18 U.S.C.§ 3553(a)(2)(A)-(D).   Having served more than 36 months in custody, Mr. Wells has been substantially punished.  A sentence of time served would appropriately penalize him for his misconduct and serve the goals of specific and general deterrence.  Mr. Wells will face serious and lifelong collateral consequences for his actions.  Just as he encountered when he finally found a job he enjoyed—working at L'Occitaine—he will be labeled as a felon for the rest of his life and always encounter challenges in finding employment.

Employment is central to altering the course of his life for his family's sake.  While Mr. Wells is not the primary care giver of his children, his family desperately needs the emotional and financial support he can provide when released from detention—not the least of which to help his autistic six-year-old son and two-year-old son with a serious heart condition, but to provide support to Ms. Ward as she deals with her new medical diagnosis.  A Guidelines sentence of 130 to 162 months here (assuming the current calculations)—would only serve to delay Mr. Wells in reconnecting with his children and starting his business to financially support his family.  Mr. Wells, because of his misconduct that has brought him before the Court, has never met or hugged his young son and he missed the past three years of his six-year-old son's life.  This has been especially painful for Mr. Wells due to the fear that his sons will grow up without him, just as he grew up without his father.  He is motivated to gain employment, live a constructive life, and contribute in a meaningful way to his sons' upbringing.  He is committed to changing the course of his life for the better.  Mr. Wells has a significant support system of friends and family that believe in him and have written letters to this Court detailing his character, his capacity for change, and his desire to be present for his young children.  It is clear based on these letters that Mr. Wells' conduct in this offense is not representative of his character.

Mr. Wells' close friend, Cordell Scott, wrote about Mr. Wells' role as a father as well as the time Mr. Wells has dedicated to a program called, "Brothers Overcoming Struggles for Success," which Mr. Scott runs.  Mr. Scott wrote, "One of the most noteworthy aspects of Mr. Wells' character is his commitment to helping others, particularly in his role as a volunteer in our character development program.  As a volunteer in "Brothers Overcoming Struggles for Success," he has played a pivotal role in shaping the lives of young individuals who face various challenges in their communities.  Through his involvement, he has shown the youth that there are positive alternatives when it comes to making life decisions.  His ability to connect with and inspire these young individuals is nothing short of remarkable."  Mr. Scott also highlighted that, "Mr. Wells is an exemplary father and brother.  His dedication to his family is unwavering, and he consistently demonstrates love, support, and a strong sense of responsibility towards his children and siblings." *See* Character Letter of Cordell Scott, Exhibit A.

Mr. Wells' half-brother, Alvin, with whom Mr. Wells reunited after being separated from for almost twenty years, wrote about Mr. Wells' capacity for change.  "My brother is not the same person he was when he entered jail.  He has evolved and grown, learning from his past mistakes.  His journey towards self-improvement is far from over, but he is steadfast in his resolve."  *See* Character Letter of Alvin Perales, Exhibit B.  The themes were consistent across the other letters submitted on Mr. Wells' behalf—he has taken responsibility for his actions and he is committed to changing his life, most importantly, to be the best father possible.  *See* Character Letters at Exhibits C through H.

## V.  CONCLUSION

This prosecution has been a long three-year journey for Mr. Wells.  The prosecutors, his counsel, and even the Judge overseeing his case have changed during its duration.  The police

officer who brought this case in the first instance is long gone, both from the case and from law enforcement, with good reason.  The only person who has been here from the beginning is Mr. Wells.  He has fought for his own rights from day one and stood before Your Honor seeking guidance on many occasions, and now seeks a just sentence.  A just resolution in this case is one that recognizes the more limited scope of his offense conduct than the Government, until sentencing, has been alleging, his traumatic upbringing, and the unjustly punitive nature of the Sentencing Guidelines with their overemphasis on monetary loss, leading to draconian guideline imprisonment ranges.  A just resolution in this case will send him back to his family immediately. For these and all the foregoing reasons, the defense respectfully requests that the Court consider the factors set forth under 18 U.S.C. § 3553(a) and impose a sentence of time served.

Respectfully submitted,

**CROWELL & MORING LLP**

*/s/ Kelly T. Currie*

Kelly T. Currie
Glen G. McGorty
Danielle L. Giffuni
Jessica L. Franzetti
CROWELL & MORING LLP
590 Madison Avenue
New York, NY 10022
Tel: (212) 223-4000
KCurrie@crowell.com
GMcGorty@crowell.com

*Attorneys for Defendant Laurell Wells*

December 12, 2023
New York, New York